**VAN DORN COMPANY d/b/a George A. Milton Can Co., Plaintiff-Appellee,**

v.

**FUTURE CHEMICAL AND OIL CORPORATION, and Sovereign Oil Company, Defendants-Appellants.**

**VAN DORN COMPANY d/b/a George A. Milton Can Co., Plaintiff-Appellant,**

v.

**FUTURE CHEMICAL AND OIL CORPORATION, and Sovereign Oil Company, Defendants-Appellees.**

Nos. 83–2316, 83–2423.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1984.

Decided Jan. 23, 1985.

Kevin M. Murphy, Latham, Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., for plaintiff.

Robert E. Nasur, Frankel, McKay & Orlikoff, Chicago, Ill., for defendants.

Before BAUER and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Plaintiff Van Dorn Company, d/b/a George A. Milton Can Company (Milton), brought an action alleging breach of contract and fraud against Future Chemical and Oil Corporation (Future), Sovereign Oil Company (Sovereign of Illinois), and Edward Roth, president of both corporations, to recover monies due Milton for various labels and cans ordered by Future and, in the case of cans, delivered to Sovereign of Illinois. In their answer defendants admitted that Future owed plaintiff $24,088.30 for goods ordered and accepted and the court granted a summary judgment against Future for that amount. Future and Sovereign of Illinois filed a counterclaim alleging a breach of warranty for the cans involved in the fraud count of the original complaint. Jurisdiction was founded on diversity and all parties have treated Illinois law as governing substantive questions. The trial court, sitting without a jury, made findings, dismissed the fraud count of the original complaint, dismissed the cause as to Edward Roth, and dismissed the counterclaim. The summary judgment was modified to include Sovereign of Illinois as jointly and severally liable with Future and to disallow $3,280.00 of art charges. Judgment was entered against Future Chemical and Oil Corporation and Sovereign Oil Company (of Illinois) jointly and severally in the amount of $57,498.62, including the summary judgment. Defendants Future and Sovereign of Illinois appeal and plaintiff Milton cross-appeals.

The issues presented for review are (1) whether the evidence warranted piercing the corporate veil to the extent of disregarding the separate corporate identities of Sovereign of Illinois and Future and treating them as a single corporate entity responsible for the obligations to Milton; (2) whether the court erred in modifying the summary judgment to disallow the art charges; and (3) whether the court erred in not imposing liability on Sovereign of Illinois and Future for cans delivered in excess of the quantity ordered, where defendants were notified of the overshipment, failed to reject the excess cans and Edward Roth promised to pay for the goods delivered.

In 1979, Edward Roth, along with two of his brothers, operated the Therm-X Chemical and Oil Corporation in Commack, New York. Therm-X was in the business of blending, packaging and distributing motor oils and other automotive products. In late 1979, the three brothers each formed separate corporations, Gibson, Tiffany, and Future Chemical and Oil Corporation. Edward Roth was the president and sole shareholder of Future and his sons Jeff and Steven were the other officers of the corporation. Future was capitalized for $50,000. Future was a distributor of motor oil and related products and operated out of the same facilities in Commack as Therm-X. Therm-X continued as an ongoing corporation and owned all of the equipment in the Commack plant. Therm-X did all of the packaging for the three corporations, sold them the filled cans at a profit and then each of the three corporations sold to its own customers. This arrangement lasted about three months when Therm-X ceased to exist as a separate corporation. Gibson, Tiffany, and Future split the remaining Therm-X accounts and did their own packaging at the Commack plant, allocating plant time among the three corporations.

In the spring of 1980, Edward Roth began negotiating to purchase the Sovereign Oil Company, an Illinois corporation, in Bedford Park, Illinois. Sovereign of Illinois was in the business of blending and packaging motor oil, but in the spring of 1980 it was in Chapter 11 bankruptcy proceedings and had been defunct for at least six months. During the negotiation period Sovereign of Illinois did some packaging for Future, with the court's approval, to avoid shutting down the plant. In May of 1980, Roth purchased all of the shares of Sovereign of Illinois for $1.00 and contributed them to Future for $1.00. Thus, Sovereign of Illinois was the wholly-owned subsidiary of Future. Edward Roth was the president of Sovereign of Illinois and his two sons, Jeff and Steven, were its other officers. An initial loan of $600,000 was made to Sovereign of Illinois by National Acceptance Corporation, secured by Roth's personal certificates of deposit. After Roth purchased Sovereign of Illinois it had a negative net worth of approximately $2,000,000.

Sometime after Roth purchased Sovereign of Illinois it began packaging all products distributed by Future and Future ceased doing any packaging at the facilities in Commack. Sovereign of Illinois packaged the product in Chicago, shipped it to Future in New York for distribution and billed Future for the total cost of the product plus a ten percent markup. All transactions of this type between the two corporations were done on a cost plus ten percent basis.

In September of 1981, Sovereign Chemical and Petroleum Corporation (Sovereign of Delaware), a Delaware corporation, was formed as a holding company. Future's stock was transferred by Roth to Sovereign of Delaware, and Future transferred all Sovereign of Illinois stock to Sovereign of Delaware for $1.00. Thus, Sovereign of Illinois and Future became the wholly-owned subsidiaries of Sovereign of Delaware. Edward Roth was the president and controlling shareholder of Sovereign of Delaware.

In 1982, Roth purchased all of the outstanding stock of an insolvent company which had blending, packaging, and manufacturing facilities in Philadelphia. Roth

formed Sovereign Oil of Pennsylvania as another wholly-owned subsidiary of Sovereign of Delaware.

Sometime in 1981, Future began to lose money and it ceased operations entirely in December of 1981. Future continued to collect receivables until 1983, however, paying Steven Roth $65,000 during 1982 for that purpose. During the time Steven Roth was paid by Future he worked a substantial portion of his time at the Sovereign of Pennsylvania plant getting that operation underway without receiving any compensation from Sovereign of Pennsylvania. Future's remaining inventory was transferred to Sovereign of Pennsylvania for $120,000 in April of 1982. Sovereign of Pennsylvania also assumed Future's remaining accounts. The money received for the inventory plus collected receivables was used to pay salaries and expenses of Future, plus debts of Future owed to Edward Roth, Sovereign of Illinois, and Sovereign of Pennsylvania. Future presently has no assets.

Sovereign of Illinois fared much better than Future during approximately the same time period. By June of 1981 Sovereign of Illinois had become a profitable operation and by June of 1982 it was solvent.

Plaintiff Van Dorn Company is a manufacturer of metal and composite cans. Through its Milton Can Division, located in New Jersey, plaintiff had been doing business with Therm-X when Edward Roth was an officer of that company. When Future began packaging for itself in Commack it also purchased cans from Milton.

In April 1980, Roth wanted to begin filling cans at the Sovereign of Illinois facility. He had not as yet established a local source for cans and consequently ordered from the plaintiff. Roth placed a telephone order with Milton for one truckload containing 17,000 Walker DOT 3 Brake Fluid cans, 12,000 Walker Carburetor Cleaner cans, 20,000 Walker Gas Octane cans and 20,000 Morak Brake Fluid cans, and another truckload of all Walker DOT 3 Brake Fluid cans (73,000 cans). Both of these truck-

loads were shipped to Chicago at Roth's instruction. Milton found that it did not have 17,000 Walker DOT 3 Brake Fluid cans in made-up stock at the time of shipment. Consequently, it shipped an additional 9,000 Morak Brake Fluid cans and an additional 9,000 Walker Gas Octane cans to complete the truckload. The excess cans were noted on the invoice sent to Future.

In May 1980 Roth ordered a roll of Whitlock Oil can labels from Milton. At Roth's request plaintiff shipped the labels to the Home Manufacturing Company in Elk Grove Village, Illinois, a local can manufacturer. Evidently the wind of the labels prevented Home Manufacturing from affixing them on cans and Sovereign of Illinois never used the labels.

In August of 1980, Roth ordered Grand Union and Big Star Motor Oil containers from Milton and picked up the containers from Milton's factory in New Jersey with his own trucks. Defendants alleged that these containers were taken to Future in New York while the plaintiff contended that they went to Sovereign of Illinois in Chicago. The trial court found that the cans went to Chicago. These cans were the subject of the court's summary judgment in favor of Milton.

The invoices for all of these shipments were directed to Future Chemical and Oil in New York, not to Sovereign of Illinois or to Ed Roth individually.

In the fall of 1980, the parties ceased doing business with each other. Roth refused to pay for the two April shipments of cans and the May shipment of labels because he contended that Sovereign of Illinois could not use them. The entire shipment of Morak Brake Fluid, Walker Gas Octane and Walker Carburetor cans was in Sovereign of Illinois' warehouse, unused as of the date of trial. Roth testified that the 73,000 DOT 3 cans were unusable due to bad lithography and were disposed of by Sovereign of Illinois. The trial court found that the cans were probably filled by Sovereign of Illinois, however, because of an absence of proof that the cans were bad and because no other complaints had been

lodged by other users of the DOT 3 cans. In addition, Roth refused to pay for the August shipment because of the dispute over the April and May shipments.

The parties exchanged letters in an effort to resolve their dispute. Edward Roth issued letters to the plaintiff on the letterheads of both Future and Sovereign of Illinois. In addition, Roth met with representatives of the plaintiff at the Sovereign of Illinois facilities to discuss the disputed invoices. These attempts were unsuccessful, and Milton brought an action alleging breach of contract to collect the amounts due for the April, May, and August shipments and for labels and printed metal stock it held in its own inventory pursuant to Roth's order for cans to be fabricated at some future time. In addition, Milton alleged fraud on the part of Edward Roth concerning an earlier shipment of cans to Future and the defendants brought a counterclaim for breach of warranty relating to the same cans which were the subject of the fraud count.

The district court entered judgment against Future and Sovereign of Illinois, jointly and severally in the amount of $57,-498.62. The judgment amount included monies for the August shipment of Grand Union and Big Star Motor Oil containers, the two April shipments minus the overshipments, the Whitlock labels, and the Milton inventory in New Jersey for which Future purchase orders existed. Prejudgment interest was awarded at the statutory rate. Judgment was denied Milton on the balance of its inventory in New Jersey and inventory held in Ohio for which no purchase orders existed and for certain art charges. Milton's claim for fraud against Roth was denied on Roth's motion for a directed verdict and its claim against Roth for personal liability was denied at the conclusion of the case. Judgment was denied on Future's and Sovereign of Illinois' counterclaims.

The trial court found Sovereign of Illinois liable for the monies due Milton on two separate theories. First, the trial court held that Sovereign of Illinois was liable for the cans it received because Sovereign of Illinois and Future were "a single corporate entity with different corporate divisions." The trial court characterized this holding as an application of the "identity analysis" of Illinois law with respect to intercorporate transactions. Second, the trial court held that Sovereign of Illinois was liable for the shipments because "[w]hether they used them or had them available to use or not, Sovereign got the benefit of the shipments, which I think they are responsible to pay for," which the trial court characterized as the *"quantum meruit* theory."

## I

The district court found that it was not by chance that Future has no assets while two other Roth corporations, particularly Sovereign of Illinois, have substantial assets; that Roth contemplated that Sovereign of Illinois would be the user of all the cans; that Roth had the cans shipped to Sovereign of Illinois, but billed to Future, which he knew was on the way out; that Roth dominated the corporations and operated them very loosely as suited his convenience without regard to the individual corporations; that Roth intermingled the corporations so completely that Sovereign of Illinois, which received and used the cans, is obligated for them as a division, with Future, of a single corporate entity.

We consider these findings not clearly erroneous, and adequate, under the law of Illinois, to support the disregard of the separate corporate identities of Sovereign of Illinois and Future.

 Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated. *Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94 (1981). However, a corporate entity will be disregarded and the veil of limited liability pierced when two requirements are met:.

[F]irst, there must be such unity of interest and ownership that the separate per-

sonalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

*Macaluso v. Jenkins*, 95 Ill.App.3d 461, 50 Ill.Dec. 934, 938, 420 N.E.2d 251, 255 (1981); *Gallagher v. Reconco Builders, Inc.*, 91 Ill.App.3d 999, 1004, 47 Ill.Dec. 555, 558, 415 N.E.2d 560, 563 (1980); *People ex rel. Scott v. Pintozzi*, 50 Ill.2d 115, 128–29, 277 N.E.2d 844, 851–52 (1971); *Dregne v. Five Cent Cab Co.*, 381 Ill. 594, 603–04, 46 N.E.2d 386, 391 (1943). In *Main Bank of Chicago v. Baker*, the Illinois Supreme Court's most recent discussion of the Illinois law of disregard of corporate entity, the Court similarly stated the two-part test of the Illinois single entity theory:

> Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.

427 N.E.2d at 101.

■ In determining whether the requisite degree of control is maintained by one corporation over the affairs of another to justify disregarding their separate corporate identities, the Illinois courts have considered some of the following: (1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own. *Main Bank of Chicago v. Baker*, 56 Ill.Dec. at 22, 427 N.E.2d at 102; *Macaluso v. Jenkins*, 50 Ill.Dec. at 939, 420

N.E.2d at 256; *Wikelund Wholesale Company, Inc. v. Tile World Factory Tile Warehouse*, 57 Ill.App.3d 269, 14 Ill.Dec. 743, 372 N.E.2d 1022 (1978); *Berlinger's Inc. v. Beef's Finest, Inc.*, 57 Ill.App.3d 319, 14 Ill.Dec. 764, 372 N.E.2d 1043 (1978); *Stap v. Chicago Aces Tennis Team, Inc.*, 63 Ill.App.3d 23, 28, 20 Ill.Dec. 230, 379 N.E.2d 1298 (1978). The separate corporate identities will be disregarded only if the condition claimed to be unjust to creditors is a result of the abuses of the corporate form. *See, Macaluso v. Jenkins*, 50 Ill.Dec. at 940–41, 420 N.E.2d at 256–57. Although an intent to defraud creditors would surely play a part if established, the Illinois test does not require proof of such intent. Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element.

Appellants acknowledge that the law of Illinois must control the question whether corporate entities are to be disregarded. They rely, however, on two decisions of this court, *Steven v. Roscoe Turner Aeronautical Corporation*, 324 F.2d 157 (7th Cir.1963), and *Matter of Palmer Trading Post*, 695 F.2d 1012 (7th Cir.1982). We must acknowledge a degree of confusion resulting from these and other decisions of this court which rely on *Turner*. [1]

*Turner* stated a rule for the disregard of corporate entities. It was a diversity case, in which state law must necessarily have governed substantive questions. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Very likely the governing law was that of Indiana, although there were contacts with Illinois as well. In any event the *Turner* opinion did not acknowledge that state law would govern

---

1. This court has consistently applied the three-part *Turner* test to cases involving piercing the corporate veil. *See e.g., Matter of Palmer Trading Post*, 695 F.2d 1012 (7th Cir.1982); *C M Corp. v. Oberer Development Co.*, 631 F.2d 536 (7th Cir.1980); *Matter of Bowen Transports, Inc.*, 551 F.2d 171 (7th Cir.1977); *Avco Delta Corp. Canada Ltd. v. U.S.*, 540 F.2d 258 (7th Cir.1976); *Bernardin, Inc. v. Midland Oil Corporation*, 520 F.2d 771 (7th Cir.1975); *Allegheny Airlines, Inc. v. United States*, 504 F.2d 104 (7th Cir.1974), without inquiring into the applicable state law.

and must be determined. The court relied primarily on a treatise, POWELL, PARENT AND SUBSIDIARY CORPORATIONS 94 (1931), as a source for its pronouncement of a rule.

Later decisions of this court applied the *Turner* rule. *See* n. 1, *supra.* There were differing bases of federal jurisdiction, but these were all cases in which the law of some state must govern the disregard of corporate entity at issue. Yet none of the decisions purported to determine or apply a state rule.

*Palmer* was a bankruptcy case, but the question presented, whether an asset of one corporation could be devoted to payment of claims against another, must clearly have been governed by the law of Illinois. Nevertheless, *Palmer* relied solely on the "stringent three-part test for corporate veil-piercing" enunciated in *Turner* and strictly adhered to in this court. There was no acknowledgement that state law must govern. Although *Main Bank* had just recently been decided by the Supreme Court of Illinois, the *Palmer* opinion made no reference to it, nor to any of the Illinois appellate decisions we have cited. All but one of them had been decided since *Turner.*

It seems clear to us that we must look to the Illinois decisions for governing state law rather than to *Turner* and the decisions of this court which applied *Turner* without attempting or making any determination of controlling state law.

We do note that *Palmer* seems to have construed *Turner* to require an "intentional abuse of control." We find nothing in the Illinois decisions requiring proof of an intent to injure creditors. When the first part of the *Main Bank* test is met, the fact that "observance of the fiction of separate corporate existence would, under the circumstances, ... promote injustice" is enough. 56 Ill.Dec. at 21, 427 N.E.2d at 101.

In *Palmer,* in any event, the claimed injury to creditors was not the result of any blurring of corporate identities. It stemmed from embezzlement by an employee. The result in *Palmer* is therefore consistent with *Main Bank.*

In concluding that the findings of the district court are not clearly erroneous, we have considered the following facts:

Edward Roth was the president and sole shareholder of both Future and Sovereign of Illinois. It appears from the record that very little attention was paid to corporate formalities such as shareholders' or directors' meetings. Mr. Kahn, the accountant for both corporations, was able to recall only one such meeting for Future Chemical. Roth traveled back and forth between New York and Chicago managing both companies. Similarly Edna Gordon, the bookkeeper for Future Chemical, traveled back and forth between New York and Chicago in 1981 overseeing the bookkeeping for both companies but being paid only by Future. In January of 1982 she moved to Chicago and was an employee of Sovereign of Illinois. Both Gordon and Kahn referred to the corporations collectively as "the company." The trial judge remarked "this is evidence, ... of the lack of delineation internally between the companies."

Numerous transactions occurred between Future and Sovereign of Illinois and later Roth's other corporations, Sovereign of Delaware and Sovereign of Pennsylvania. Future transferred money to Sovereign of Illinois in order for the latter to begin operations, later Sovereign of Illinois loaned Future money to help keep it afloat. When Future became insolvent it apparently "owed" money to the other three corporations. Future acquired the Sovereign of Illinois stock for the nominal sum of $1.00 when it had a negative net worth of $2,000,000. When Sovereign of Delaware was formed the Sovereign of Illinois stock was transferred from Future to Sovereign of Delaware for the same $1.00, despite the fact that Sovereign of Illinois had become profitable in the meantime. All of the Roth corporations utilized consolidated accounting statements which eliminated intercompany accounts for presentation. Kahn testified that separate reports for each corporation were never prepared, although

they all had separate books. While the attorney for the defendants stressed that the corporations kept separate books, all that appears from the record is a confusion of corporate records and finances. The record of the intercompany transactions supports the trial court's finding that "Mr. Roth operated these things very loosely, as he saw fit. Things went back and forth.... [t]hey did this as it suited their convenience, without regard to the ... individual corporations." *See Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157, 1160–61 (5th Cir. Unit A 1981).

The day to day business transactions between Future and Sovereign of Illinois also appear suspect. Sovereign of Illinois, the manufacturing and packaging facility, eventually provided all of the product distributed by Future. Future paid Sovereign of Illinois for the entire cost of each shipment, including containers, contents, and a ten percent profit, despite the fact that according to the defendants, Future was the purchaser of the cans from Milton, not Sovereign of Illinois. There is no testimony to the effect that Sovereign of Illinois purchased cans from Future and then sold those same cans to Future filled with oil. When Future was purchasing filled cans from Therm-X, Therm-X purchased the empty cans. After Kahn described how Sovereign of Illinois computed the selling price for goods sold to Future the court asked him, "So Sovereign really purchased the cans, right?" and Kahn responded, "Oh, yes." While the parties were trying to resolve this dispute among themselves, Edward Roth assured Scherr, Milton's sales representative, that Sovereign of Illinois, not Future, would pay for the Whitlock labels, the Walker Gas Octane and the Morak Brake Fluid cans. During the course of these intercorporate transactions between Sovereign of Illinois and Future, Sovereign of Illinois became profitable and moved toward solvency while Future lost money and was eventually left with no assets. The record supports the trial court's finding that Future and Sovereign of Illinois were intermingled to such an

extent that Roth operated them as a single corporate entity.

The trial court found that the transition from Future to Sovereign of Illinois and Sovereign of Pennsylvania was a purposeful one. "[I]t isn't perchance that Future, who Mr. Roth now says is the only person whose credit was on the line in these transactions, has no assets, while two other Roth corporations have substantial assets, and particularly the one who received the shipments [of Milton cans], which utilized them." The record clearly supports the court's finding that the assets of Future were dissipated for the benefit of the other Roth corporations and to the injury of Milton Can.

The most striking evidence of the depletion of Future's assets is Steven Roth's salary. After Future ceased operations in December of 1981 it continued to "operate" until April of 1983 to collect receivables. It paid Steven Roth $65,000 a year during 1982 for that purpose. However, from April of 1982 Steven Roth spent most of his time working for Sovereign of Pennsylvania. He never received any salary from Sovereign of Pennsylvania during that time. The trial court found that in July of 1982 Future had $180,000 of current assets: $120,000 received from Sovereign of Pennsylvania for Future's remaining inventory, $48,000 of accounts receivable, and $12,000 cash. Virtually all of that money was disbursed to Edward Roth individually or to the other Roth corporations as loan repayments to settle intercorporate accounts. Future was left with no assets. Milton is the only vendor Future is indebted to.

■ Edward Roth dominated both Future and Sovereign of Illinois and intermingled them to such an extent that their separate corporate personalities ceased to exist. Eventually Future was stripped of its assets and rendered insolvent to the prejudice of Milton, its only creditor, while Sovereign of Illinois received the benefits of the Milton can shipments. The record supported the trial court's finding that such a result was unjust and warranted

piercing the corporate veil between Future and Sovereign of Illinois to hold Sovereign of Illinois liable for the price of the cans.[2]

## II

In the cross-appeal Milton challenges the amounts awarded for two of the items included in the total judgment of $57,488.62. Milton appeals from the disallowance of $3,280.00 representing certain art charges which were awarded to Milton in the court's summary judgment order of October 1, 1982, but later deducted from it. Additionally, Milton appeals from the trial court's ruling that Milton is not entitled to recover for the 9,000 Walker Gas Octane cans and the 9,000 Morak Brake Fluid cans which were delivered to Sovereign of Illinois over and above the quantity of cans ordered.

In challenging the disallowance of the art charges Milton contends: (1) that the evidence was insufficient to support the modification of the summary judgment and (2) that Milton had been led to believe that the court had allowed a challenge to a judgment against Sovereign of Illinois for the art charges but had denied any attempt to reopen the summary judgment against Future and that Milton was prejudiced by the subsequent modification of Future's liability. We find both of these contentions to be without merit.

■ Both James Milton, president of Milton Can Company, and Edna Gordon testified concerning a meeting they had at the Sovereign of Illinois plant in Chicago to discuss complaints over various shipment shortages and the disputed art charges. Ms. Gordon testified that Mr. Milton had agreed to a credit for the disputed art charges. Mr. Milton testified in a very general manner that he had agreed to credit Future for some of the disputed items, but he never specifically testified to giving or denying a credit for the art charges. Based on this evidence the trial court found that Milton had agreed to a credit and

thereby waived recovery for the art charges. The trial court could have reasonably inferred from the testimony of Gordon and Milton that Milton had agreed to credit Future for the art charges. The finding is not clearly erroneous.

■ Milton's further contention that it had been misled and prejudiced by the trial court's reopening of the summary judgment as to Future's liability is untenable. Defendant's attorney, Mr. Masur, clearly indicated that he sought to modify the summary judgment against Future and the trial judge granted him leave to proceed. Furthermore, Milton's argument that it would have more vigorously rebutted Edna Gordon's testimony if it had known that Future's liability was subject to modification is specious. Future was insolvent. Milton was clearly looking to Sovereign of Illinois for payment of the summary judgment. It is implausible that Milton's alleged misperception as to the scope of the summary judgment modification prejudiced the presentation of plaintiff's case in any manner. Lastly, Milton failed to object to the modification of the summary judgment against both Future and Sovereign of Illinois at the trial level and thus failed to preserve this issue for appeal.

## III

The final issue before this court on the cross-appeal is whether the trial court erred in ruling that Milton Can was not entitled to payment for cans shipped in excess of the quantity ordered.

The trial court found that in April of 1980 Roth ordered 20,000 Morak Brake Fluid cans and 20,000 Walker Gas Octane cans. Milton shipped in excess of 29,000 of each for its own convenience. The record indicates that Future was notified of the overshipment by the Milton invoice for the cans which had been stamped "received, May 06, 1980," a receiving record signed by Wayne Greigas, the plant foreman of Sov-

---

**2.** Having affirmed the district court's imposition of liability on Sovereign of Illinois on the basis of piercing the corporate veil we need not reach the issue of whether *quantum meruit* was properly applied in this case.

ereign of Illinois, and a packing list, also signed by Wayne Greigas, indicating the quantity ordered, 20,000, and the quantity actually shipped, 29,000+. The trial court found that in two conversations with Mr. Scherr, one on July 25, 1980 and one on August 29, 1980, Roth agreed that Sovereign of Illinois would pay for the Morak and Walker cans. In a subsequent meeting with James Woodworth, a sales representative from Davies Can, a Van Dorn subsidiary, on December 10, 1980 at the Sovereign of Illinois facility, Roth told Woodworth that he could not fill the gas octane cans at Sovereign of Illinois but that he would keep the Morak cans. Roth made no objection to the number of Morak or Walker cans shipped at this meeting.

The trial court held that Milton could only recover for the 40,000 cans actually ordered, not the 58,000 cans which Sovereign of Illinois received. The judge stated, "under the facts and circumstances of this case, where the shipment of the additional amount was for your convenience and without confirmation or approval by the purchaser. I do not think that you can overship and then put the burden on the customer to say, 'I didn't order that many.' I don't think the Uniform Commercial Code so requires."

Milton argues that the trial judge erred in his interpretation of the Illinois Commercial Code. We agree.

Where "goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." Ill.Rev.Stat. ch. 26 § 2–601. An excess in quantity of goods delivered is a nonconformity. *See* Illinois Code Comment to § 2–601. The buyer has a duty to reject nonconforming goods "within a reasonable time after their delivery or tender," Ill.Rev. Stat. ch. 26 § 2–602, and a failure to make an effective rejection will operate as an acceptance of the goods. Ill.Rev.Stat. ch. 26 § 2–606(1)(b). "The buyer must pay at the contract rate for any goods accepted." Ill.Rev.Stat. ch. 26 § 2–607(1). The com-

ment to § 2–607 indicates that it combines the rules set forth in the former Uniform Sales Act § 41 and § 44(1) and (2) and that § 44(2) required the buyer to pay for an excess in quantity of goods at the contract rate.

■ In the present case the defendants were put on notice of the nonconformity of the shipment by the invoice, the receiving record, and the packing slip and failed to make a timely rejection of the goods. The failure timely to reject operated as an acceptance of the excess goods. In addition, Roth agreed to accept and pay for the goods in his conversation with Scherr. "Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured." Ill.Rev.Stat. ch. 26 § 2–607(2). Roth could not have reasonably assumed that Milton would take the excess cans back after he failed to reject them and then agreed to pay for them. Upon such facts, the law requires that defendants pay Milton for the full amount of cans delivered.

## CONCLUSION

For the foregoing reasons the judgment of the district court is AFFIRMED in part and REVERSED in part. On the direct appeal, the judgment of the district court is AFFIRMED. On the cross-appeal, the trial court's disallowance of the art charges is AFFIRMED, but the trial court's limitation of Milton's recovery to the 40,000 cans ordered rather than the 58,000 received is REVERSED. The case is REMANDED to the district court for modification of the judgment to reflect Sovereign of Illinois' and Future's joint and several liability for the 18,000 excess cans. Plaintiff may recover three-fourths of its costs on appeal.