**UNITED EQUITABLE LIFE INSURANCE COMPANY,**
Plaintiff,

v.

**TRANS GLOBAL CORPORATION, Trans–Global Insurance Agencies, Inc., Trans Global Insurance Company, Richard Klein, and Woodburn Gailey, Defendants.**

No. 83 C 5408.

United States District Court,
N.D. Illinois, E.D.

Feb. 18, 1988.

Fruman Jacobson, Peter J. Valeta, Katharine B. Devoid, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff.

Michael Null, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff, United Equitable Life Insurance Company ("United") filed a motion for summary judgment on counts I through IX of its complaint against defendants Trans Global Corporation, Trans–Global Insurance Agencies, Inc., Trans Global Insurance Company ("Trans Global"), Richard Klein ("Klein") and Woodburn Gailey ("Gailey") (collectively referred to as "the defendants"). United also moved for summary judgment in their favor on counts II, III and IV of defendants' counterclaim. On February 4, 1988, United voluntarily dismissed count I of its complaint. On this Court's own motion, count IV of the counterclaim was dismissed.[1] For the reasons set forth below, this Court grants United's motion for summary judgment on counts II, III, IV, V, VII and IX of its complaint and on counts II and III of defendants' counterclaim. We deny United's motion on counts VI and VII of its complaint and dismiss counts VI and VIII.

---

1. On January 15, 1988, this Court ordered both parties to file a RICO statement on or before January 22, 1988 in preparation for trial. On January 29, 1988, we again ordered the parties to comply with this Court's RICO order. In response, United voluntarily dismissed the RICO count of the complaint. Trans Global did not comply with either order. Consequently, we dismissed Trans Global's RICO counterclaim with prejudice and without costs. *See* Order of February 4, 1988.

## Facts [2]

This cause of action arises from a failed business relationship. In February, 1982, United entered into two agency agreements with Trans–Global.[3] United entered into a Regional General Agent's Agreement with Woodburn Gailey and a State General Agent's Agreement with Richard Klein. In November, 1982, United entered into a State General Agent's Agreement with Woodburn Gailey.[4] Pursuant to these agreements,[5] the defendants agreed to sell United's two life insurance policies.

Basically, defendants were to market United's policies to individuals and employer groups. When an applicant agreed to purchase United's insurance, defendants were to send to United a completed application and the first month's premium for the insurance purchased. Each application contained a certification clause in which the agent who sold the policy certified that the applicant had paid the intial premium for the policy.

Under the agreements, United paid unearned advance commissions ("debit balances")[6] to the defendants for each application and initial premium submitted. United advanced defendants seventy percent (70%) of the projected annual premiums associated with each application, even though only one month's premium had been submitted. The agreements provided that the debit balances were due and payable upon demand. While outstanding, interest accrued on the debit balances at a rate of one percent (1%) per month.

Shortly after executing the agreements, defendants began submitting policy applications with initial premium payments. For each premium received, United paid to defendants advances in accordance with the terms of the agreements. Each application contained the certification that the premiums were paid by the applicant. Defendants, however, did not collect the premiums from the applicants. Instead, defendants paid the premiums and collected the unearned advance commissions from United. At no time did defendants inform United that the certification on each application was false and that defendants were paying the premiums on the policies procured by Trans Global agents. In effect,

2. In the Appendix to this opinion, we have attached Undisputed Facts. These Facts are based upon United's statement of material facts as to which no genuine issue exists. *See* Local Gen. R. 12(e). United provided this Court with detailed citation to various documents, deposition transcripts and affidavits. In addition, defendants failed to controvert United's 12(e) statement when defendants filed their 12(f) statement in support of their memorandum in opposition to United's motion for summary judgment. Because defendants do not controvert United's 12(e) statement, this Court deems the statements admitted pursuant to Local Gen.R. 12(f).

3. Defendants Klein and Gailey contend that they are not agents and that only Trans–Global is an agent pursuant to these agreements. We find that this contention must fail. In Illinois, the existence of an agency relationship may be established by circumstantial evidence. *See Hofner v. Glenn Ingram & Co.,* 140 Ill.App.3d 874, 880, 95 Ill.Dec. 90, 94, 489 N.E.2d 311, 315 (1st Dist.1985). In this case, we do not have to rely upon circumstantial evidence because the written agency agreements are direct evidence of the agency relationship. Both Klein and Gailey are listed as agents on the agreements. Neither Klein nor Gailey signed the agreements "as agents" for Trans–Global. And, indeed, Gailey stated in his deposition that he had procured an application for insurance from at least one employer group. The agreements unambiguously indicate that Klein and Gailey were agents for United. Trans–Global was merely the vehicle through which Klein and Gailey plied their trade.

4. The State General Agent's Agreement which was signed by Gailey denominates the agent as Trans–Global. The Regional General Agent's Agreement which is signed by Gailey denominates as agents both Gailey and Trans–Global. The signature page refers to Trans–Global Insurance Agencies, Inc. The State General Agent's Agreement which is signed by Klein denominates as agents both Klein and Trans–Global and at least one signature page refers to Trans–Global Insurance Agenies, Inc.

5. These three agreements are the product of an agreement between United and R & J Sales, Inc. and Basic, Inc., ("R & J"), whereby R & J's two partners, James Seffren ("Seffren") and Richard Drews ("Drews"), agreed to recruit agents to sell United's insurance. As the recruiting agreement provided, the agency agreements entered into pursuant to the recruiting agreement were independent of the recruiting agreement.

6. The agreements denominated the unearned advance commissions as the debit balance.

defendants marketed United's life insurance policies as "free insurance" to the policyholders and United paid unearned advance commissions for policies which the defendants certified as *sold* to policyholders.

Early in 1983, United exercised its unconditional right under the agreements to discontinue the payment of unearned advance commissions, thereby electing to pay commissions to defendants as such commissions were earned. Defendants then ceased their payment of the premiums on the policies they "sold", which caused the policies to lapse. United demanded that defendants pay their debit balance in full. Defendants refused. In August, 1983, United terminated their agency agreements with defendants and filed this suit.

## DISCUSSION

Under Fed.R.Civ.P. 56, a court will grant a motion for summary judgment "if the record, including pleadings, depositions and answers to interrogatories, admissions and affidavits, shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Fed.R.Civ.P. 56.] All factual inferences are to be taken against the moving party and in favor of the opposing party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed. 2d 142 (1970)." *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1378 (7th Cir.1985).

■ As a preliminary matter, we note that Illinois law applies to the pendant claims. In the agreements, defendants agreed to both a forum selection clause and a choice of law clause. These clauses spec-

ify that suit be brought in Illinois courts and that Illinois law apply. Illinois courts will enforce contractual choice of forum and choice of law provisions. *See Sarnoff v. American Home Products*, 798 F.2d 1075, 1081 (7th Cir.1986).

### The Contract Claims

In counts II, III and VII of its complaint, United seeks to hold defendants liable for breaches of their agency agreements. In count II, United alleges that defendants breached their agency agreements when they failed to repay their debit balance when United demanded repayment. In count III, United alleges that defendants breached their agency agreements by failing to remit to United premiums collected from United's policyholders. In count VII, United alleges that defendants breached their agency agreements by stopping payment on two checks submitted to United representing premiums purportedly collected from various applicants. For the reasons stated below, this Court grants United's motion for summary judgment on counts II, III and VII.

■ The plain language of these agreements requires this Court to grant United's motion for summary judgment. Paragraph 7 of the State General Agent's Agreement provides that the term "advance" means "loan". Paragraph 7 also provides that the advances are due and payable on demand.[7] The State General Agent's Agreements contained addenda which states "that all sums advanced ... shall be treated and considered as loans ... and [the State General Agent] ... agrees to pay to [United] on demand all sums advanced under this Agreement, with interest at the rate of 1%

7. Paragraph 7 specifically provides that "[a]ny sum that may be advanced or loaned at the State General Agent's request shall be and become a debt of the State General Agent to the Company due and payable upon demand. Whenever the term advance is used, the same shall nevertheless be construed to mean a loan. The State General Agent agrees to indemnify the Company for any fees and expenses that the Company may incur in the collection of any indebtedness or for any legal action brought by or against the State General Agent to which the Company may be a party. It is further agreed that the Company may, if it so desires, employ its own counsel in defense of any legal proceeding to which it may be a party, and all expenses of such litigation, including costs and attorney fees, shall, in any event, be paid by the State General Agent. Best efforts shall be exerted to consult the State General Agent prior to incurring such costs."

per month on all debit balances." [8]

In their response, defendants correctly point out that defendants signed a note, attached to their State General Agent's Agreement as Exhibit III, in which they agreed to repay their debit balances within eighteen months after termination rather than on demand.[9] This clause conflicts with a number of clauses in the agreements which provide that the debit balance is payable on demand. In addition, each agreement also contains a clause which provides that United may terminate the agreement *forthwith* in the event that defendants commit certain misdeeds.[10]

Where possible, a court will construe conflicting provisions of a contract so as to give effect to all of the contract's provision. Where one intention is expressed in one clause and another, different intention is expressed in another clause, full effect should be given to the more principal and specific intention, and the general clause shall be subjected to such modification as the specific clause makes necessary. *See McDonald's Corp. v. Butler Co.*, 158 Ill. App.3d 902, 909, 110 Ill.Dec. 735, 740, 511 N.E.2d 912, 917 (2d Dist.1987). In this case, the more specific provision enumerates specific misdeeds which will allow United to terminate the agreements forthwith.

United could, and did, terminate these agreements "forthwith" because of defendants' various breaches of these agreements. Defendants have not repaid the debit balance after almost five years, even though Klein, in his deposition, conceded that defendants were liable to United for the advances. Consequently, this Court grants summary judgment for United on count II of its complaint.

■ In count III, United alleges that the defendants breached their agreements by failing to remit premiums "purportedly" collected from policyholders. Despite the fact that the agreements expressly provide that agents will not pay premiums, *see* State General Agent's Agreement, ¶ 21, defendants did exactly that. In spite of their conduct to the contrary, defendants did certify that the premiums they remitted to United were collected from policyholders. As a consequence, United paid to the defendants unearned advance commissions based upon the applications and initial premiums received by United.

In response, defendants make two arguments. First, defendants lamely argue that United, through James Seffren, authorized defendants to market United's policies free. Second, defendants argue that United breached its implied duty of good faith and fair dealing by abruptly terminating its relationship with defendants. Both these arguments are meritless.[11]

---

**8.** Paragraph 8 grants United a lien on all commissions payable pursuant to the agreements and provides that interest shall accrue on such indebtedness at the rate of one percent (1%) per month.

**9.** In relevant part, the Note and Agreement provides:
Upon termination of my State General Agent's Contract for any reason, I agree to pay my debit balance in full within eighteen months of the termination date.

**10.** Paragraph 12 provides that:
"[S]hould the State General Agent wrongfully withhold any funds, policies, premium receipts, vouchers or other property belonging to the Company or to any applicant for insurance, or others, or should he refuse to pay any indebtedness owing to the Company by virtue of this contract, or violate any governmental law or regulation relating to the subject of insurance, or fail to comply with the rules and regulations of the Company or the terms of this contract, or

should the State General Agent at any time endeavor to induce the agents of the Company to leave its service, or its policyholders to relinquish their policies, this contract, may be terminated forthwith (without restricting the right of the Company to terminate this contact on sixty (60) days' written notice), and all rights and claims of the State General Agent hereunder, including the claim for payment of any further sums of money, shall likewise be terminated, and he shall not be entitled to receive any further commissions or other sums of money, whatsoever, from the Company. Nothing herein contained shall preclude the Company from seeking damages or further redress from the State General Agent."

**11.** We summarily dismiss defendants' second argument. The record in this case reveals that defendants were given an opportunity to cure their breaches of these agreements before United terminated its relationship with them. *See* Plaintiff's Motion for Summary Judgment, Ex-

United had two relationships with James Seffren. First, Seffren was an authorized agent in the same manner as defendants. Second, Seffren, and his company, R & J Sales, Inc., were hired by United to recruit agents for United. Seffren's recruiting contract provides that agents recruited by Seffren will negotiate agency agreements directly with United.[12] Furthermore, in addition to the standard recitals that the written contract represented the entire agreement and that all prior oral and written understandings were merged therein, the agreements which defendants signed contained merger clauses that provided that modifications of the agency agreement were invalid "unless made in writing duly signed by an officer of [United]". *See* State General Agent's Agreement, ¶ 17; Regional General Agent's Agreement, ¶ 17. These provisions, by themselves, negate defendants' argument. In addition, defendants readily admit that they created the "free" marketing program, *see* Appendix, ¶ 29, and that no one associated with United authorized defendants to market United's policies for free. *Id.*, ¶ 27. Accordingly, this Court grants United's motion for summary judgment on count III.

■ In count VII, United alleges that defendants breached their agency agreements by stopping payment on two checks submitted to United representing premiums purportedly collected from various applicants. Defendants again admit that they so breached their agreements with United. *See* Appendix, ¶ 22, 23. As their only defense to this allegation, defendants assert that United wrongfully discontinued advancing unearned commissions to defendants. This "defense" must fail. United did not, indeed it could not, breach its agreement with defendants by exercising its unconditional right to discontinue its practice of advancing unearned commissions to defendants. Accordingly, this Court grants United's motion for summary judgment on count VII.

### Common Law Fraud

■ In count IV, United alleges that defendants are liable to United for damages by reason of their common law fraud. In Illinois, to establish civil liability for common law fraud, United must clearly and convincingly demonstrate the essential elements of fraud:

(1) a false statement of a material fact;

(2) which defendant knows or believes is false;

(3) made with the intent to induce the other party to act;

(4) which in fact induces the other party to act in reasonable reliance upon the false statement, and;

(5) which causes damage to the other party.

*See Merit Insurance Co. v. Colao,* 603 F.2d 654, 658 (7th Cir.1979), *cert. denied* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980).

Basically, United argues that defendants misrepresented the character of the applications they procured on behalf of United. Instead of procuring "good business",[13] United contends that defendants developed a marketing scheme whereby defendants procured applications for insurance for United by promising to pay the premiums for the proposed policyholders. Defendants, however, submitted applications which certified that proposed policyholders, and not defendants, paid the premiums. In

---

hibit D. United's conduct in no way breached any duty of good faith or fair dealing.

**12.** Paragraph 6 of the Recruiting and Product Development Agreement provides that:
"R & J Sales may recruit Agents in the assigned territory, subject to the terms of this Agreement. All contracts made with such Agents shall be made directly with the Company in writing on the Company's form, and shall become effective when both (1) executed by the Company and (2) the agent is licensed. R & J Sales shall have no authority to modify or amend any such contract. The Company may refuse to contract with any proposed Agent and may terminate any contract with an Agent in accordance with the terms of such agency agreement."

**13.** Defendant Gailey coined the term "good business." He defined good business as applications for which the policyholder paid the initial and subsequent premiums.

addition, United contends that defendants convinced United of defendants' need to bill the policyholders rather than allow United to follow its standard practice of directly billing policyholders. By billing the policyholders directly, defendants were able to hide their marketing scheme and to continue to defraud United into paying large amounts of unearned commission advances. In fact, United paid large advances to defendants.

In accordance with the court's order, *see* Order of November 20, 1985 (Grady, J.), the facts supporting United's allegations in count V were deemed admitted. These facts are set forth in paragraph 24 of the Appendix to this opinion. Essentially, defendants submitted applications for insurance to United. Defendants certified that the policyholders paid the premiums. In fact, defendants paid the initial and subsequent premiums. Defendants sent the applications to United expecting United to advance defendants unearned commissions. United did pay such advances in reliance upon the certifications [14] and United was damaged in the amount of those advances. Accordingly, this Court grants United's motion for summary judgment on count IV.

### Breach of Common Law and Statutory Fiduciary Duties

■ In counts V and VI, United alleges that defendants breached their common law and statutory fiduciary duties to United. United alleges that defendants breached their common law fiduciary duty by failing to inform United that defendants were paying the premiums on the policies and by falsely representing to United, via the certifications accompanying each application, that the policyholders were paying the premiums when, in fact, defendants were marketing United's policies as "free insurance." United contends that defendants breached their statutory duty to act as a fiduciary with regard to funds received by them in violation of sections 1733 and 1734 [15] of the Insurance Code of California. *See* West's Ann.Cal.Ins.Code §§ 1733, 1734 (Supp.1987).[16] We agree that defendants

14. Defendants' argument that United authorized the free marketing program is bogus. In fact, defendants admit that United did not authorize defendants' marketing scheme expressly, *see* Appendix, ¶ 27, or through any agent. *See* Discussion at 774–775. Furthermore, the face of the applications in no way indicated that the premiums were actually being paid by defendants. *See* Appendix, ¶ 26.

15. In its pleadings, United cites section 1744 of the Insurance Code of California. *See* West's Ann.Cal.Ins.Code § 1744 (Supp.1987). Section 1744 concerns disciplinary actions which may be taken against an agent. We believe that United erroneously referred to section 1744 when it meant to refer to section 1734. Section 1734 concerns the maintenance of fiduciary funds.

16. Section 1733 of the Insurance Code of California provides that:

All funds received by any person acting as an insurance agent, broker, or solicitor, life agent, life analyst, surplus line broker, special lines surplus line broker, motor club agent, or bail agent or solicitor, as premium or return premium on or under any policy of insurance or undertaking of bail, are received and held by such person in his fiduciary capacity. Any such person who diverts or appropriates such fiduciary funds to his own use is guilty of theft and punishable for theft as provided by law. Any premium which a premium financer agrees to advance pursuant to the terms of a premium finance agreement shall constitute fiduciary funds as defined in this section only if actually received by a person licensed in one or more of the capacities herein specified.

Section 1734 of the Insurance Code of California provides that:

This section applies to any person licensed, whether under a permanent license, restricted license, temporary license, or certificate of convenience, to act in any of the capacities specificed in Section 1733. If fiduciary funds, as defined in Section 1733, are received by such person, he shall * * *:

(a) Remit premiums, less commissions, and return premiums received or held by him to the insurer or the person entitled thereto, or

(b) Maintain such fiduciary funds on California business at all times in a trustee bank account or depository in California separate from any other account or depository, in an amount at least equal to the premiums and return premiums, net of commissions, received by him and unpaid to the persons entitled thereto or, at their direction or pursuant to written contract, for the account of such persons. As used in this section, "trustee bank account or depository" includes but is not limited to a checking account, demand account, or savings account, each of which shall be designated as a trust account. However, such person may commingle with such fiduciary funds in such account or depository such additional funds as he may

breached their common law fiduciary duty but find that defendants' misconduct does not fall within the ambit of sections 1733 and 1734 of the Insurance Code of California. *Id.*

Defendants, as agents for United, owed United a fiduciary duty to act in United's best interest and to conform their conduct to the highest standards of honesty, integrity and fidelity. *See Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill.App.3d 151, 160, 98 Ill.Dec. 663, 668, 494 N.E.2d 785, 790 (1st Dist.1986). Defendants, while denying that Klein and Gailey were United's agents, admitted that these obligations existed with regard to Trans–Global. *See* Appendix, ¶ 14. Because we find that Klein and Gailey were agents for United,[17] these obligations also apply to them. We find that they breached these obligations by their fraudulent conduct.

■ While we find that defendants have breached their common law fiduciary duties, we do not find that defendants' misconduct subjects them to liability for breaching their statutory fiduciary duties, at least not the duties enumerated in the sections cited by United. Sections 1733 and 1734 codify a fiduciary duty to maintain funds "received as premiums and return premiums" in trust for the benefit of the policyholder and the insurance company. West Ann.Cal.Ins.Code § 1733 (Supp. 1987). Section 1734 requires an agent to discharge his fiduciary obligations either by remitting premiums to the insurer or by maintaining such funds in a trust account or in accordance with other regulations of the Insurance Code. *Id.*, § 1734. Defendants do not appear to have violated these provisions because they never received any premiums from proposed policyholders. Instead, defendants remitted their own funds to United. Such conduct does not seem to fall within the language of these statutes. Accordingly, we find that defendants have not breached these particular statutory fiduciary duties.

We find that defendants have breached their common law fiduciary duties. We also find that defendants have not breached their statutory fiduciary duties. Accordingly, we grant in part and deny in part United's motion for summary judgment for breach of common law and statutory duties and dismiss count VI.

### Interference with Contractual Relations

■ In count VIII, United alleges that defendants intentionally interfered with United's insurance contracts with policyholders recruited by defendants. United argues that defendants interfered with United's contractual relationship with its policyholders by failing to collect premiums from the policyholders and by marketing United's policies as "free insurance." United states that once it elected to discontinue paying unearned advance commissions to defendants,[18] defendants stopped paying premiums on the policies, thereby causing the policies to lapse. United contends that it was damaged by defendants' conduct because if defendants had collected the premiums from policyholders, United would have a certain amount of repeat business from those policyholders. Under Illinois law, allegations that a defendant induced the breach of an at-will contract states a cause of action for interference with prospective economic advantage and not an action for interference with contractual relations. *See Prudential Insurance Co. of America v. Sipula*, 776 F.2d 157, 162 (7th Cir.1985). Consequently, we deny United's motion for summary judgment on count VIII and dismiss count VIII because United failed to properly plead a cause of action for interference with prospective economic advantage.

---

deem prudent for the purpose of advancing premiums, establishing reserve for the paying of return commissions or for such contingencies as may arise in his business of receiving and transmitting premium or return premium funds, or

(c) Maintain such fiduciary funds pursuant to Section 1734.5.

**17.** We previously rejected Klein's and Gailey's argument that they were not agents of United. *See* n. 2, *supra* at 772.

**18.** Ironically, defendants assert United's "prior breach" of these agreements as a defense. This argument is baseless. *See* Discussion at 775.

## Piercing the Corporate Veil

In count IX, United alleges that Trans–Global and various related companies are the alter ego of Klein and Gailey. United argues that the interests of justice require that the corporate fiction be disregarded and that this Court hold Klein and Gailey personally liable.

"Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated." *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569 (7th Cir.1985), *citing Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 56 Ill. Dec. 14, 427 N.E.2d 94 (1981). A court will disregard the fiction of the corporate form and pierce the veil of limited liability when two requirements are met:

(1) There must be a unity of ownership and interest such that the separate personalities of the corporation and the individuals no longer exist.

(2) Adherence to the fiction of separate corporate existence must sanction fraud or promote injustice.

*See Van Dorn*, 753 F.2d at 569–70. Illinois courts consider a variety of factors when determining whether an individual (or another corporation) maintains the degree of control over the affairs of another entity which justifies disregarding their separate identities. First, courts will determine whether the corporation has failed to maintain the corporate formalities or adequate corporate records. Second, courts will determine if the entities have commingled funds or assets. Third, courts will determine whether a corporation is undercapitalized. Fourth, courts determine whether an individual or entity treats the assets of another entity as its own. *Id.*, 753 F.2d at 570.

In this case, defendants adhered to the corporate formalities when they established their corporations. *See* Plaintiff's Motion for Summary Judgment, Exhibit G. We do note that the bylaws of Trans–Glob-

al Insurance Agencies, Inc. and Trans Global Insurance Corporation are identical. Similarly, the minutes of the different corporations for any given year are carbon copies of one another and, over the span of years, hardly change. *See* Plaintiff's Reply Brief, Exhibit U. The similarities between the bylaws and the corporate minutes of these distinct corporations argues for a finding that the maintenance of the corporate formalities is a sham.

Defendants have commingled funds and assets. Commission advance checks sent by United to defendants were deposited in joint accounts. Trans–Global's corporate books disclose that corporate funds were used to purchase a car for Klein's wife and to pay her department store charges. Corporate ledger sheets also reveal that defendants frequently transferred funds between various Trans Global entities. These facts support a finding that the funds and assets have been commingled and that the individual defendants have treated the assets of the corporation as their personal funds.[19]

These facts suggest that the corporate fiction of limited liability be disregarded and that defendants Klein and Gailey be held personally liable for the fraud they perpetrated on United. Accordingly, this Court grants United's motion for summary judgment on count IX.

## The Affirmative Defenses

We summarily dismiss defendants' affirmative defenses. The facts demonstrate that United did not authorize or ratify defendants' "free" marketing scheme. Because United acted within the letter and spirit of its agreements with defendants, we find that United did not breach any implied duty of good faith and fair dealing. *See* Discussion at 773–775.

## The Counterclaims

Because we find that United has not breached any duty, implied or otherwise, of

---

**19.** United made no argument regarding the undercapitalization of the Trans Global corpora-

tions.

good faith and fair dealing, we grant United's motion for summary judgment on count II of defendants' counterclaim.

�full Count III of defendants' counterclaim must also fail. Defendants undermine their own claim of fraud. First, defendants claim that United, through James Seffren, misrepresented that it would not terminate its relationship with defendants except for good cause.[20] Because we find that *defendants* committed fraud against United, United had "good cause" to terminate its relationship with defendants. Second, defendants claim that United, through Seffren, misrepresented that United would not demand return of any debit balance until it was "earned out". Defendants, however, signed an agreement which provided that United could discontinue paying unearned advances and could demand immediate repayment of the debit balance. Consequently, defendants' counterclaim for fraud must fail. Accordingly, we grant United's motion for summary judgment on count III of defendants' counterclaim.

### The RICO Claims

▪ Both United and defendants allege violations of RICO. This Court has previously ordered both parties to prepare a RICO statement in preparation of trial. On February 4, 1988, pursuant to Fed.R. Civ.P. 41(a)(2), United voluntarily dismissed count I of its complaint. On that same day, this Court, on its own motion, dismissed the RICO counterclaim because defendants did not comply with this Court's previous orders of January 15, 1988 and January 29, 1988.

### CONCLUSION

This Court grants United's motion for summary judgment as to liability on counts II, III, IV, V, VII and IX of its complaint and on counts II and III of defendants' counterclaim. We deny United's motion on counts VI and VIII of its complaint and dismiss counts VI and VIII. Pursuant to United's motion, we dismiss count I of the complaint. On our own motion, we dismiss count IV of the counterclaim.

### APPENDIX

### UNDISPUTED FACTS

1. Trans Global Corporation and Trans Global Insurance Agencies, Inc. are California corporations with their principal place of business in California. They have done and are doing business in numerous other states, including Illinois, in their own names, and/or under the fictitious name Trans Global Insurance Company.

2. Klein and Gailey are citizens of California, and associated with Trans Global. Klein is the president and chief executive officer of Trans Global. Gailey is the executive vice president of Trans Global.

3. Trans Global, Klein and Gailey were each licensed by the state of California to act as agents for United within California under the name Trans Global Insurance Agencies, Inc.

4. United and Trans Global entered into the contracts whereby Trans Global became Regional General Agent and State General Agent for United.

5. The only agreements between defendants and United Equitable Life Insurance Company are the Regional and State General Agent Agreements ("Agreements").

6. Neither Klein nor Gailey knows how the Regional General Agent's Agreement, signed by Gailey and dated February 17, 1982, the State General Agent's Agreement signed by Klein and dated February 17, 1982, or the State General Agent's Agreement signed by Gailey and dated November 1, 1982 were received by defendants.

7. Pursuant to the Agreements, Trans Global was authorized to procure applications for insurance contracts with United.

8. Trans Global was obligated, pursuant to the Agreements and to its fiduciary duties to United and its policyholders, to submit to United only bona-fide applications for insurance.

---

20. We previously found that Seffren was not an agent of United authorized to change the written terms of the agent's agreements between United and defendants.

9. Pursuant to the Agreements, defendants were obligated to promptly remit to United all premium payments collected for applicants and policyholders on United's behalf.

10. Pursuant to the Agreements, United agreed to pay unearned advance commissions to Trans Global calculated on the amount of annualized first-year commission which could be earned by Trans Global on applications which were accompanied by an initial premium paid by the applicant (or his employer) and submitted to United. United would advance Trans Global 70% of such future commissions based upon projected premiums for the entire year, even though only one month's premium had been submitted with the application.

11. Pursuant to the Agreements, all unearned commission advances ("debit balance") were loans from United to Trans Global. While outstanding, interest was charged on the debit balance created by such loans at the rate of 1% per month.

12. Pursuant to the Agreements, defendants are obligated to exert their best endeavors to keep all United insurance contracts in force.

13. Trans Global was an agent of United, and as such, it owed United and its policyholders a fiduciary duty.

14. Trans Global's fiduciary duties to United and its policyholders included the duty to conform their conduct to the highest standards of honor, honesty, integrity and fidelity; the duty to act solely and entirely in the best interest of United and its policyholders; the duty to account for funds which are held in trust for the benefit of United and its policyholders.

15. Trans Global marketed two United life insurance policies: the Modified 20–Year Endowment Plan and the Modified Whole Life Policy.

16. Upon the submission of an application with the initial premium for the Modified 20–Year Endowment Plan, advances were made by United to Trans Global equalling 70% of the total annual premium even though only the first month's premium had been submitted.

17. Shortly after executing the Agreements, Trans Global began submitting policy applications with initial premium payments. Pursuant to the Agreements, United began paying advances to Trans Global based upon such applications.

18. Each Modified 20–Year Endowment Plan and Modified Whole Life Policy, when sold by defendants to an applicant, constituted a contract of insurance between United and each policyholder.

19. Defendants knew that insurance contracts existed between United and the policyholders to whom defendants sold United policies.

20. United terminated in writing the Agreements and all business relationships with defendants as of August 3, 1983.

21. Klein does not dispute that the defendants owe a debit balance of at least $400,000 to $500,000 to United.

22. On or about April 22, 1983, Trans Global sent United two checks in the amounts of $3,423.41 and $2,329.48 ("Checks") in remittance of premiums for policy applications previously submitted to United by Trans Global.

23. On May 6, 1983, Trans Global stopped payment on the checks.

24. Pursuant to this Court's Order dated November 22, 1985, the following are admitted facts:

(a) Defendants, their employees, agents and representatives submitted 642 applications for United insurance, each of which was signed by the Trans Global agent whose signature appears thereon.

(b) The total initial premium amounts and the total monthly premium amounts reflected on each of the 642 applications were the initial and monthly amounts due for the policies which were issued pursuant to the applications.

(c) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, obtained each of the 642 applications from the named applicant reflected on each.

(d) Trans Global, Klein or Gailey, either directly or through one of their affiliates,

employees or agents, did not collect the initial premium payments reflected on the 642 applications from the proposed applicants or their employers.

(e) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, paid the initial premium payments reflected on the 642 applications to United Equitable Life Insurance Company.

(f) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, sent each of the 642 applications accompanied by the initial premium payments for each through the U.S. Mail to United Equitable Life Insurance Company.

(g) Trans Global, Klein or Gailey expected to receive, either directly or through one of their affiliates, employees or agents, a commission advance from United Equitable Life Insurance Company for each of the 642 applications.

(h) Trans Global, Klein or Gailey received, either directly or through one of their affiliates, employees or agents, a commission advance from United Equitable Life Insurance Company for each of the 642 applications.

(i) For each of the 642 policies issued pursuant to the applications submitted to United by defendants, Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, did not collect the premiums which came due after submission of the initial premium payment.

(j) For each of the 642 policies issued pursuant to the applications submitted to United by defendants, Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, paid the premiums which came due after submission of the initial premium to United Equitable Life Insurance Company.

(k) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, sent the premiums which came due after the submission of initial premiums in connection with the policies issued pursuant to the 642 applications through the United States Mail to United Equitable Life Insurance Company.

(l) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, did not inform United Equitable Life Insurance Company that the applicants listed on the 642 applications did not pay the initial premiums or the premiums which came due after submission of the initial premium for the policies issued pursuant to such applications.

(m) Trans Global, Klein or Gailey, either directly or through one of their affiliates, employees or agents, did not bill for or collect the premiums which came due after May 1, 1983 for the policies issued pursuant to the 642 applications.

25. The applications submitted by defendants to United Equitable Life Insurance Company stated that the initial premiums were collected from the applicant or employer.

26. Nothing in the documents submitted by defendants to United with the applications and purported "premiums" indicated that the premiums were actually being paid by defendants.

27. No one associated with United Equitable Life Insurance Company authorized defendants to market the Modified 20–Year Endowment Plan by giving it away for free.

28. Defendants never told anyone associated with United that defendants were marketing the Modified 20–Year Endowment Plan by giving it away free.

29. Klein and Gailey created the marketing program of selling the United Equitable Modified 20–Year Endowment Plan by giving the policies away for free.

30. Defendants never sought approval from United to give away the Modified 20–Year Endowment Plan.

31. Gailey does not know of any other circumstances in which policies similar to the Modified 20–Year Endowment Plan were marketed by giving them away for free.

32. Gailey was a licensed agent in California who personally marketed the United products as "free insurance."

33. As agents for United Equitable Life Insurance Company in California, defendants were required to comply with the requirements of the California insurance code.

34. Gailey sent a letter dated July 3, 1982, requesting that United send the billings to Trans Global for premiums for insurance policies sold by defendants and not bill the policyholders directly.

35. Gailey sent a letter dated September 10, 1982, in which he complained to United about the fact that United was still billing policyholders directly instead of submitting premium bills to defendants.

36. Based upon his 25 years experience in the life insurance industry, Gailey acknowledged that it was not unusual for life insurance companies to reserve the right to discontinue advancing under agency contracts.

37. Klein does not know of any standard agreement or provision for the length of time during which commission advances would be paid by insurers to agents.

38. Based upon his 15 years experience in the insurance industry, Klein recognizes that unearned commission advances are amounts owed to the insurer.

39. Klein and Gailey are the sole stockholders and owners of Trans Global.

40. Klein considers himself as owning 70% of all Trans Global corporations.

41. Neither Klein nor Gailey knows how many shares are outstanding in the Trans Global corporations.

42. All of the Trans Global corporations conduct their business out of 875 Mahler Road, Suite 250, Burlingame, CA 94010.

43. The directors of Trans Global Corporation, Trans Global Insurance Corporation and Trans Global Insurance Agencies, Inc. are Richard Klein, Woodburn Gailey and Robert Slosberg.

44. The officers of Trans Global Corporation, Trans Global Insurance Corporation and Trans Global Insurance Agencies, Inc. are president, Richard Klein, executive vice-president, Woodburn Gailey, and secretary/treasurer, Robert Slosberg.

45. Klein and Gailey do not receive salaries from Trans Global; they draw money from time to time on a haphazard basis solely at their request.

46. None of the Trans Global corporations have ever paid any dividends.