In re WOODSTOCK ASSOCIATES I, INC., an Illinois corporation, d/b/a Albany House, Woodstock Associates III, Inc., an Illinois corporation, d/b/a The Woodbury of Niles, Woodstock Associates II, Inc., an Illinois corporation, d/b/a The Saratoga of Evanston, Woodstock Associates IV, Inc., an Illinois corporation, d/b/a The Sherwood of Niles, Debtors. (Jointly Administered Cases)

HOME SAVINGS ASSOCIATION OF KANSAS CITY, F.A., Plaintiff.

v.

WOODSTOCK ASSOCIATES I, INC., Woodstock Associates III, Inc., Woodstock Associates II, Inc., Woodstock Associates IV, Inc., Defendants.

Bankruptcy Nos. 89 B 08919 to 89 B 08922.
Adv. No. 90 A 0145.

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 24, 1990.

Norman Newman, Scott N. Schreiber, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for debtors.

Neil L. Goulden, Katten, Muchin & Zavis, Chicago, Ill., for Caremor, Inc.

Ronald R. Peterson, Jay S. Geller, Jenner & Block, Chicago, Ill., for Home Sav. Ass'n of Kansas City, F.A.

David E. Cohen, Cohen & Krol, Chicago, Ill., for the Unsecured Creditors Committee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes to be heard on the joint motion of the Debtors and the Committee for the Unsecured Creditors (the "Committee") for summary judgment pursuant to Federal Rule of Civil Procedure 56. In addition, Home Savings Association of Kansas City, F.A. ("Home Savings") filed a cross motion for partial summary judgment. For the reasons set forth herein, the Court having reviewed the pleadings, affidavits and the exhibits attached

thereto, grants in part the motion of the Debtors and the Committee for summary judgment on Counts I, II and III and denies the motion as to Count IV. Moreover, the Court hereby denies the cross motion of Home Savings for summary judgment.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these motions pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. These matters constitute core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (K) and (0).

## II. FACTS AND BACKGROUND

The matters in dispute arise from the Debtors' operation of four nursing homes. The relevant history and relationships among the parties follows. Ridgeview Pavilion Realty Partnership ("Ridgeview Pavilion") owned and operated a nursing home facility in Evanston, Illinois. On August 13, 1986, Ridgeview Pavilion transferred legal title to the nursing home facility to Amalgamated Trust & Savings Bank ("Amalgamated Bank") as Trustee under Trust No. 5188. Ridgeview House Realty Partnership ("Ridgeview House") owned and operated a nursing home facility in Evanston, Illinois. On September 12, 1986, Ridgeview House transferred legal title to the nursing home facility to Amalgamated Bank as Trustee under Trust No. 5195. Golf Mill Plaza I Realty Partnership ("Golf Mill I") owned and operated a nursing home facility in Niles, Illinois. On September 12, 1986, Golf Mill I transferred legal title to the nursing home facility to Amalgamated Bank as Trustee under Trust No. 5196. Golf Mill Plaza II Realty Partnership ("Golf Mill II") owned and operated a nursing home facility in Niles, Illinois. On September 12, 1986, Golf Mill II transferred legal title to the nursing home facility to Amalgamated Bank as Trustee under Trust No. 5197.

On September 25, 1986, Amalgamated Bank as Trustee under said Trusts executed two promissory notes in favor of Home Savings in the principal amounts of $5,000,000.00 and $19,500,000.00. In addition, Amalgamated Bank executed a Mortgage and Security Agreement (the "Mortgage") and a separate Assignment of Rents and Leases (the "Assignment") in favor of Home Savings to secure repayment of the notes. On January 19, 1988, Woodstock Associates, Ltd. ("Woodstock"), an Illinois corporation incorporated on December 31, 1987, as lessee, entered into a lease (the "Lease") with Golf Mill I, Golf Mill II, Ridgeview House and Ridgeview Pavilion, the sole beneficiaries under Amalgamated Bank Trust Nos. 5196, 5197, 5195 and 5188 as lessor to lease all four nursing home facilities and all the fixtures and equipment ·contained therein. The Lease was for a ten year period, subject to certain rights to terminate the Lease at an earlier time. Paragraph 24.1 of the Lease contained language granting a security interest in Woodstock's accounts receivable to secure the rent payable under the Lease. The Lease was never recorded with the Cook County Recorder of Deeds.

On January 19, 1988, Woodstock entered into four separate unrecorded Subleases (the "Subleases") with the Debtors. The Subleases were also for a term of ten years, subject to rights to terminate upon sixty days notice. Collectively, the Debtors are four separate Illinois corporations, incorporated on January 19, 1988. The Debtors and Woodstock have common officers and directors.

Thereafter, on June 7, 1988, the Debtors as subtenants, Woodstock as the tenant under the Lease, Home Savings as beneficiary, and Golf Mill I, Golf Mill II, Ridgeview Pavilion and Ridgeview House (hereinafter collectively referred to as either the "Trust Beneficiaries" or the "Lessor") entered into a Non–Disturbance, Attornment, Estoppel and Subordination Agreement (the "Attornment Agreement"). The Attornment Agreement provided that Home Savings would attorn to the Lessor's rights under the Lease upon certain terms and conditions. Pursuant to the Attornment Agreement, upon the Lessor's default under the existing Mortgage, Woodstock and the Debtors were required to pay the rent-

als reserved under the Lease and Subleases to Home Savings. The Attornment Agreement expressly incorporated the Lease and was recorded on September 2, 1988. By letter dated October 17, 1988, Jack Ehrenhaus, one of the Trust Beneficiaries' partners, directed Woodstock to make all future rent payments under the Lease to the order of Home Savings. In accordance with the letter, Home Savings thereafter received three rental payments in the aggregate amount of $390,000.00.

On January 27, 1989, Woodstock notified the Trust Beneficiaries and Home Savings' counsel, in writing, of its intent to terminate the Lease within ninety days pursuant to Article XXI, paragraph 21.8 thereof. The Debtors assert that they then received proper sixty day notices from Woodstock to terminate the Subleases, effective on April 27, 1989. Thereafter, on February 16, 1989, Home Savings filed a complaint in the Circuit Court of Cook County, Illinois (Case No. 88 CH 5219) to foreclose the Mortgage. Subsequently, on March 10, 1989, Home Savings filed a verified petition for appointment of a receiver to replace the Debtors as the operators of the nursing home facilities pursuant to the Illinois Mortgage Foreclosure Law, rather than under the Nursing Home Care Act.[1] On April 26, 1989, Judge Arthur L. Dunne denied the petition. Judge Dunne stated that he was unwilling[2] "to be adventurous and act in contravention of the plain language of the statute." However, he stated that he could consider the appointment of a receiver "at the behest of the State."

On April 27, 1989, the State of Illinois filed a petition in the Circuit Court of Cook County, Illinois, (Case No. 89 CH 3415) to place the four nursing home facilities under the control of a receiver pursuant to the Nursing Home Care Act. That day, Judge Robert L. Sklodowski appointed Caremor, Inc. ("Caremor") to act as receiver. On February 21, 1990, Judge Dunne entered an order in the foreclosure action confirming the foreclosure sale and the Uniform Commercial Code sale, conducted pursuant to the case, and entered a deficiency judgment in favor of Home Savings and against Amalgamated Bank as Trustee in the amount of $7,389,095.78.

Subsequent to April 27, 1989, both Caremor and the Debtors collected medicaid reimbursements from the State of Illinois. Those medicaid reimbursements collected by Caremor, however, were insufficient to fund the operating expenses of the nursing homes facilities during the period of Caremor's receivership. As a result, Home Savings subsequently advanced funds to Caremor and refrained from collecting rent, which resulted in a claim in excess of $3.4 million for rent and real estate tax payments. Home Savings asserts that it has advanced over $4.5 million to maintain the facilities.

On May 26, 1989, the Debtors filed voluntary Chapter 11 petitions. The Debtors formerly operated the four nursing home facilities, but their operations were supplanted pre-petition upon Caremor's appointment as receiver. The Debtors are currently acting as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The cases are being jointly administered. Substantially all of the assets available for distribution from the Debtors' estates in the approximate amount of $779,824.00 plus interest, constitute medicaid reimbursements from the State of Illinois for the care of the elderly and disabled residents of the nursing homes for the pre-receivership, pre-petition period ending April 26, 1989. These medicaid reimbursements are the subject of the instant dispute.[3]

---

1. Under the Nursing Home Care Act, as amended, only the State of Illinois, a nursing home resident, or a resident's representative or next of kin may petition to obtain the appointment of a receiver. Ill.Rev.Stat. ch. 111½, para. 4153–501, 4153–503 (1989). Thus, Home Savings lacked standing under the Nursing Home Care Act to obtain the appointment of a receiver and accordingly had to proceed under the Illinois Mortgage Foreclosure Law Ill.Rev.Stat. ch. 110, para. 15–1101 to 15–1706 (1989).

2. The original transcript of the hearing incorrectly referenced the word willing. Neither party contests the fact that the word Judge Dunne used was unwilling.

3. On August 2, 1989, the Court entered an order directing the Debtors to endorse certain other

The Debtors filed a joint liquidating plan of reorganization and a disclosure statement. The Court approved the Debtors' second amended disclosure statement and set a hearing on confirmation of the plan on March 26, 1990. On that date, the Court continued the hearing on confirmation generally, pending the outcome of the motions at bar. On March 7, 1990, Home Savings filed this adversary proceeding against the Debtors. The four count complaint is premised on the theory that Home Savings succeeded to the Lessor's interests by virtue of the Attornment Agreement. Count I seeks a declaration that Home Savings has a valid and perfected first priority lien on the Debtors' pre-petition medicaid reimbursements as part of their accounts receivable pursuant to the Attornment Agreement and the Assignment entered into between the Lessor and Home Savings. In Count II, Home Savings seeks an administrative claim pursuant to 11 U.S.C. § 503(b) for the deficiency in rent that was owed by Caremor while it operated the nursing home facilities post-petition as receiver. Count III seeks an administrative claim under section 503(b) for reimbursement of amounts paid by Home Savings including payroll, taxes and repairs to operate the nursing home facilities post-petition. Counts II and III assert that the Debtors are liable for such items under various provisions of the Nursing Home Care Act as "owners", notwithstanding the pre-petition appointment of Caremor as receiver. Finally, Count IV objects to confirmation of the Debtors' plan of reorganization.

Subsequently, on April 12, 1990, the Debtors filed a joint motion for summary judgment. Thereafter, on June 6, 1990, Home Savings filed a cross motion for summary judgment. Responses and replies thereto were filed by each party. In addition, the requisite Local Rule 12 statements were filed. The matter was then taken under advisement on July 12, 1990.

medicaid reimbursements to Caremor, which are not at issue for purposes of the instant motions. Under the Nursing Home Care Act, Caremor, as receiver, from the date of its appointment had the statutory power and duty to

## III. ARGUMENTS OF THE PARTIES

The joint motion for summary judgment seeks relief in favor of the Debtors on all four counts of the complaint. The Debtors argue that the Attornment Agreement does not provide Home Savings with a security interest in the Debtors' accounts receivables, and thus, Home Savings holds no secured position in the subject medicaid reimbursements. Moreover, the Debtors deny that they are alter egos and mere instrumentalities of Woodstock. Furthermore, the Debtors contend that Home Savings is not entitled to any administrative claim because neither the Subleases nor any interest in the nursing home facilities were part of the Debtors' estates as of the date the Chapter 11 petitions were filed. Additionally, the Debtors argue with respect to the plan of reorganization that it follows the congressionally mandated liquidation distribution scheme, and thus, Home Savings' objections to confirmation lack merit.

In the cross motion for summary judgment, Home Savings seeks a determination that it properly perfected the Assignment; that the medicaid reimbursements received by the Debtors are subject to that Assignment; that the Debtors remain liable for post-petition operating deficiencies incurred by Caremor; and that Home Savings is entitled to allowance of an administrative claim for its post-petition maintenance of the nursing home facilities. Home Savings alleges that the joint motion for summary judgment should be denied as there are genuine issues as to material facts. Home Savings claims that those facts are as follows: the Debtors are alter egos and mere instrumentalities of Woodstock and are not separate corporations; the plan of reorganization fails to comply with the applicable provisions of the Bankruptcy Code; and the plan of reorganization was not proposed in good faith, as it is an alleged tax avoidance scheme. Home Savings effectively denies termination of the Subleases.

operate the nursing home "facilities" (as defined in ¶ 4151–113) and to collect payment for all goods and services provided to residents during the receivership (¶ 4153–508(d)).

Home Savings further denies that the purported termination of the Subleases extinguished the Debtors' respective alleged liabilities under the Nursing Home Care Act.

The Debtors deny that the Attornment Agreement conveyed to Home Savings any security interest in their accounts receivable, but conveyed only interests in Woodstock's rents and receivables *inter alia* to Home Savings. The Debtors further deny liability for the deficit receivership operations of Caremor or liability for the allegedly owing, but unpaid rents and other expenses claimed by Home Savings. The Debtors assert that advances made by Home Savings during Caremor's receivership were expended to protect its collateral and not the property of the Debtors' estates.

## IV. STANDARDS FOR SUMMARY JUDGMENT

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see also Donald v. Polk County*, 836 F.2d 376, 378–379 (7th Cir. 1988). In 1986, the Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute." *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Federal Sav. & Loan Ass'n*, 806 F.2d 146, 149 (7th Cir.1986)). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita*, 475 U.S. at 585–586, 106 S.Ct. at 1355–1356. There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250, 106 S.Ct. at 2510–2511; *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.1987), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. Moreover, all reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988); *Marine Bank, Nat. Ass'n v. Meat Counter, Inc.*, 826 F.2d 1577, 1579 (7th Cir.1987); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987); *In re Calisoff*, 92 B.R. 346, 350–351 (Bankr.N.D.Ill.1988). Furthermore, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under the applicable law. *Donald v. Polk*

*County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The parties have filed cross motions for summary judgment. Each motion must be ruled on independently and all motions must be denied if there are genuine issues of material fact. *ITT Industrial Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987).

Rule 12 of the General Rules of the United States District Court for the Northern District of Illinois adopted by General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts as to which they contend there is no genuine issue. Rule 12 also requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If the Rule 12 statement fails to deny the facts set forth in the movant's statement, those facts will be deemed admitted. In the case at bar, each party has filed its requisite Rule 12 statements.

## V. DISCUSSION

### 1. *COUNT I*

Pursuant to Count I of the complaint, Home Savings seeks a determination that it possesses a valid and perfected first priority lien on the Debtors' pre-petition accounts receivable which include the collected medicaid reimbursements. In order to reach this conclusion, the Court must find, as Home Savings has conceded: (1) that the medicaid reimbursements constitute rents; (2) that Home Savings properly perfected the Assignment; and (3) that the Debtors are alter egos and mere instrumentalities of Woodstock.

### A. ARE THE MEDICAID PAYMENTS RENTS OR ACCOUNTS RECEIVABLE AND DID THE DEBTORS CONVEY INTERESTS THEREIN TO HOME SAVINGS

■ The initial threshold issue is whether the medicaid reimbursements are rents derived from real property, subject to the Assignment, the Lease and the Attornment Agreement in favor of Home Savings, or whether they are more in the nature of general intangible personal property interests in which Home Savings has no perfected position.

Home Savings argues that the Attornment Agreement references the Assignment and the Lease. These instruments allegedly encompass the medicaid payments. Home Savings relies on paragraph 3 of the Attornment Agreement which provides that:

If the interests of Landlord [the Trust Beneficiaries] shall be transferred to and/or owned by Beneficiary [Home Savings] by reason of judicial foreclosure, power-of-sale foreclosure or other proceedings brought by it, or by any other manner, including but not limited to Beneficiary's exercise of its rights under any assignment(s) of leases and rents, and Beneficiary succeeds to the interest of the Landlord under the Lease, Tenant [Woodstock and the Debtors] shall be bound to Beneficiary under all of the terms, covenants and conditions of the Lease for the balance of the remaining term thereof and any extension thereof duly exercised by Tenant with the same force and effect as if Beneficiary were the Landlord under the Lease, and Tenant does hereby attorn to Beneficiary as its landlord, said attornment to be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto immediately upon Beneficiary's succeeding to the interest of the Landlord under the Lease. The respective rights and obligation of Tenant and Beneficiary upon such attornment, to the extent of the then remaining balance of the term of the Lease and any such extension, shall be and are the same as now set forth therein (unless otherwise modified by this Agreement), it being the intention of the parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein. In

the event of a conflict between the terms and provisions of the Lease and the terms of this Agreement, the terms of this Agreement shall control, and the Lease shall be deemed to have been modified in accordance herewith.

Central to Home Savings' argument is its contention that the medicaid reimbursements were nothing more than rental payments made on behalf of the nursing home residents to pay for the beds and living space they occupied. A separately recorded Assignment was given to Home Savings by the Trust Beneficiaries as Lessor. This instrument secured rents reserved under the unrecorded Lease to which Woodstock was a party as lessee. The Lease in turn at Article XXIV, paragraph 24.1 thereof, gives the Lessor a security interest in "the accounts receivable of lessee [Woodstock]" and coupled with the Assignment, gives the Lessor an assignment of rents subject to the right of Woodstock to collect rents as long as Woodstock was not in default under the Lease. Neither the Assignment nor the Lease were executed by the Debtors. Moreover, neither instrument included as part of the collateral securing the Lease payments any of the medicaid payments or other accounts receivable owed to the Debtors, who were subtenants of Woodstock. There is no reference to medicaid payments or other accounts receivable owed to the Debtors in either document by which they granted to Home Savings any interest in the subject medicaid reimbursements.

■ In fact, the Mortgage held by Home Savings specifically excluded from the referenced Assignment the "underlying patients' leases or agreements." (Mortgage p. 8, para. 8). The receivables and rents as to which the Lessor received an assignment, subsequently conveyed to Home Savings, were those of Woodstock as lessee pursuant to paragraph 24.1 of the Lease and not those of the Debtors as sublessees. Hence, standing in the Lessor's shoes, Home Savings was not granted a security interest in the medicaid payments collected

by the Debtors, only Woodstock's accounts receivable. The Debtors' execution of the Attornment Agreement is not sufficient to convey any interest therein as required under Illinois real property law. An assignor cannot convey any greater title or interest than he had in the assignment. *Angelina County Lumber Co. v. Michigan Central Railroad Co.*, 252 Ill.App. 82, 89 (1929). An assignee acquires only the title and rights of the assignor. *Town & Country Bank v. James M. Canfield Contracting Co.*, 55 Ill.App.3d 91, 12 Ill.Dec. 826, 370 N.E.2d 630 (4th Dist.1977).[4]

If the funds are considered personal property, critically fatal to Home Savings' argument is the lack of any written security agreement and filed financing statement signed by the Debtors covering the medicaid reimbursements owing to the Debtors as required by Ill.Rev.Stat. ch. 26, paras. 9–201, 9–203, 9–204, 9–302, 9–303, and 9–306 (1989). From the documents furnished, the Debtors never expressly or impliedly granted Home Savings a security interest as required by paragraph 9–203(1) in their account receivables, as defined by paragraph 9–106. At best, Home Savings argues that when the Debtors signed the Attornment Agreement which referenced the Lease, they therefore impliedly granted a security interest in their receivables as Woodstock expressly did under paragraph 24.1 of the Lease. The Court will not impliedly find such a security interest granted by the Debtors as a result of the mere execution of the Attornment Agreement. Even this tenuous construction fails because none of the Debtors executed a financing statement filed at any time perfecting such a security interest in favor of Home Savings.

Rent is defined in Black's Law Dictionary as: "[c]onsideration paid for use or occupation of property.... Compensation or return of value given at stated times for the possession of lands and tenements corporeal." If the medicaid payments constitute rents payable under a lease of real estate, they are expressly excluded from

---

4. Home Savings admits that it must prove that the Debtors are alter-egos of Woodstock. The

Court will address this issue further on in the discussion.

.

the scope of Article 9 of the Uniform Commercial Code. Ill.Rev.Stat. ch. 26, para. 9–104(j). *See generally* Clark, *The Law of Secured Transactions Under the Uniform Commercial Code,* ¶ 1.8[10][b] (1980 and 1988 Cum.Supp.) (collecting cases and noting that a prudent lender will take no chances and perfect an assignment of rents under local real estate law and Article 9); *see also* 2 J. White and R. Summers, *Uniform Commercial Code,* §§ 23–7 and 23–8 (3d ed. 1988 and 1990 Supp.).

■ Under Illinois law, the rents and profits derived from the use of mortgaged real property are an incident of the equity of redemption and belong to the mortgagor until the mortgagee has taken affirmative steps to enforce his rights in such respect. *See generally* 27 Illinois Law and Practice, *Mortgages,* § 117–120 (1956 and 1990 Supp.). No evidence has been furnished the Court, however, that the medicaid reimbursements received by the Debtors are truly in the nature of compensation paid for patient use and occupancy of the underlying real estate, subject to the Mortgage, the Assignment, the Attornment Agreement and leasehold interests assigned to Home Savings under which the Debtors were subtenants.

By contrast, paragraph 9–106 of the Illinois version of the Uniform Commercial Code defines "account" as any right to payment for services rendered, which is included within that section's definition of a "general intangible", a personal property interest. The Debtors' rights to receive medicaid reimbursement payments from the State of Illinois for the various nursing home services rendered to patients, seems more in the nature of a personal property right constituting "accounts receivable" in the nature of "general intangibles", rather than interests in real property constituting rentals received from use and occupancy of an estate or interest in real property. No showing has been made that either the residents of the nursing homes (or for that matter the State of Illinois) had any subsubtenancies in the real property leased by the Debtors. Thus, the medicaid reimbursements owed by the State of Illinois to the Debtors appear more properly characterized as personal property and subject to the requirements of Article 9, rather than appropriately considered as real estate rentals.

This conclusion is buttressed by a recent decision discussing the current manner in which state agencies administering medicaid reimbursement programs contract with nursing homes who supply the services to eligible medicaid recipient patients. In *In re Wayne Manor, Inc.,* 117 B.R. 12 (D.Mass.1990) the district court in Massachusetts explained how the medicaid system works:

> The plaintiff is a nursing home participating in the Medicaid program. Under the Medicaid system, the defendant Department of Public Welfare (DPW) pays funds to nursing homes based on an interim rate established by the Rate Setting Commission. At the end of any given year, a final rate is established for each participating nursing home. If the final rate is lower than the interim rate at which funds were paid out, then the nursing home owes the difference to the DPW. Conversely, if the final rate is higher than the interim rate, then the DPW owes the nursing home the difference.

*Id.* at 13.

Hence, *Wayne Manor* appears to summarize the way in which the medicaid reimbursement program presently functions, at least in Massachusetts. It does not appear to involve, depend on, or relate to conveyance of interests in real property from participating nursing homes to either the administering state agency disbursing the funds or the patient recipients who receive nursing home services for which the payments from the agency pay in whole or in part.

The "medicaid program" is the popular name of Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396 *et seq.* The medicaid program, enacted in 1965, provides federal grants to the states to furnish medical assistance to families with dependent children and to the aged, blind or permanently disabled, whose income and re-

sources are insufficient to meet the costs of necessary medical services. The medicaid program also furnishes rehabilitation and other services to help the eligible participants to attain or retain the capability for independence or self-care. Unlike the medicare program, which is a joint federal-state program, the states have considerable latitude in determining the eligibility requirements and the scope of services provided. Medicaid assistance in the form of direct payments to suppliers of medical care and services is thus provided by the respective states, with federal financial participation for eligible recipients. The states participating under the medicaid program must provide certain inpatient and out patient hospital services, laboratory services, skilled nursing home care and various other related medical services. A participating state medicaid plan under prescribed rules must specify the amount and duration of each item of the medical and remedial care and services that will be provided to the eligible patients. The statute provides a comprehensive list of the services and sets forth the minimum requirements that a state must meet, and those that a state may include under a medicaid plan. 42 U.S.C. § 1396a. The items of services include skilled nursing facility services, among other related medical, dental and clinical services. A state medicaid plan must provide, *inter alia*, for the establishment or designation of a state authority to be responsible for establishing and maintaining standards for private or public institutions in which recipients of medicaid assistance under the state plan receive care or services. 42 U.S.C. § 1396a(a)(9). Furthermore, it must provide for certain levels of duration and assistance to eligible recipients. 42 U.S.C. § 1396a(a)(10). Moreover, medical assistance must include reasonable eligibility standards. 42 U.S.C. § 1396a(a)(17). Additionally, it must also provide that any skilled nursing facility which receives payments under the state plan must satisfy various requirements. 42 U.S.C. § 1396a(a)(28) and § 1395x(j). The state plan must include a program which sets forth requirements for licensing of administrators of nursing homes. 42 U.S.C. § 1396g.[5] Consequently, the payments from the State of Illinois to the Debtors pursuant to the State's medicaid reimbursement plan more closely correspond to the definition of "accounts" and "general intangibles" under the Illinois version of the UCC, rather than "rents" for use and occupancy of real property.

Home Savings cites and relies upon one decision which characterized medicaid reimbursements to a nursing home as rents. In *In re Flower City Nursing Home, Inc.*, 38 B.R. 642 (Bankr.W.D.N.Y.1984), the court found that medicaid reimbursement were rents which were subject to the mortgagee's assignment of rents. The mortgagee commenced a foreclosure action and obtained the appointment of a receiver. On the next day, a bankruptcy petition was filed. The bankruptcy court enjoined and restrained the continuation of the foreclosure action and restrained the receiver from taking possession. The debtor-in-possession failed to comply with a compromise of stay litigation and subsequently the bankruptcy trustee entered into an agreement with the New York State Department of Health pursuant to which a receiver was appointed to operate the nursing home facility. The receiver collected medicaid reimbursements, to which both the bankruptcy trustee and the mortgagee claimed an interest. The *Flower City* court stated with respect to the medicaid reimbursements:

> These funds were reimbursement for the use and occupation of the realty and not for the daily operation of the nursing home business. Generally, rents and profits are income generated from the occupation or use of the realty and not income generated from general business operations. (citation omitted).

38 B.R. at 644.

The court concluded that the medicaid reimbursements constituted rent which was subject to the mortgagee's security documents. The *Flower City* case is not dis-

5. An extended discussion of the medicaid program is contained in 2 H. McCormick, *Medicare and Medicaid Claims and Procedures,* Ch. 20–26 (2d. ed.1986 and 1988 Supp.).

positive on the issue of whether the instant medicaid reimbursements constitute rent. The parties in that case "agreed the funds on hand are reimbursement for capital rather than operating costs." *Id.* at 643. Such factor appears to be critical and outcome determinative of that case. No such agreement is present between the Debtors and Caremor or the Debtors and the State of Illinois. Accordingly, *Flower City* does not stand for the proposition that all medicaid reimbursements are rent. Moreover, *Flower City* was decided under the former Bankruptcy Act and its holding is based upon New York real property law, and therefore is not controlling here.

Thus, in the final analysis, if the medicaid reimbursements are characterized as real property rentals, the record is devoid of any evidence by which the Debtors clearly conveyed any interest in same to Home Savings to secure the leasehold payments owed by Woodstock. If, on the other hand, the medicaid reimbursements are more appropriately characterized as personal property interests in the nature of accounts receivable, there is no written security agreement executed by the Debtors in Home Savings' favor, nor any filed financing statement perfecting a security interest in same by Home Savings. Either way, Home Savings loses on this issue.

## B. HOME SAVINGS FAILED TO PERFECT THE ASSIGNMENT OF RENTS

■ The next issue is whether Home Savings perfected its lien on the rents under the terms of the Mortgage, the other security instruments and Illinois law. Illinois law allows a mortgagee to take collateral security in rents. However, in order to be entitled to the rents, the mortgagee must obtain possession of the property or the appointment of a receiver. *See* Ill.Rev. Stat. ch. 110, paras. 15–1215, 15–1702(b) and 15–1704; *see also Taylor v. Osman*, 239 Ill.App. 569, 574 (1926); *Freedman's Saving & Trust Co. v. Shepherd*, 127 U.S. 494, 502–503, 8 S.Ct. 1250, 1254, 32 L.Ed. 163 (1988) ("the mortgagee is not entitled to the rents and profits of the mortgaged premises until he takes actual possession, or until actual possession is taken, in his behalf, by a receiver ... or until, in proper form, he demands and is refused possession"). Once a mortgagee has obtained possession of the property or appointment of a receiver, he is entitled to future rents. Under the current Illinois Mortgage Foreclosure Law, a mortgagee shall be entitled to designate the receiver (paragraph 15–1702(b)); the receiver so appointed shall have possession of the mortgaged real estate (paragraph 15–1704(b)), and the power to collect the rents, issues, and profits from the mortgaged real estate (paragraph 15–1704(b)(2)).

When a bankruptcy petition is filed, a secured creditor's interest is limited to his interest in the debtor's property on the date of the filing. Section 552(a) of the Bankruptcy Code cuts off the effect of after-acquired property clauses contained in security documents. Section 552(b) provides as an exception, a security interest in proceeds, profits and rents of secured property continues in effect to the extent that the security document and applicable non-bankruptcy law allow. Sections 552 and 546(b) potentially support the position that Home Savings has a perfected security interest in rents owed by Woodstock as lessee to its Lessor. Section 552(b) provides as follows:

> Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b).

Notwithstanding Illinois law, section 546(b) permits perfection of certain liens by

lesser means where the automatic stay would prevent the usual manner of perfecting a lien. Section 546(b) provides in relevant part:

The rights and powers of a trustee ... are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

11 U.S.C. § 546(b).

The purpose of the subsection is to protect those whom state law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection. It is not designed to give the states an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy cases. H.R.Rep. No. 595, 95th Cong., 1st Sess. 371 (1977), U.S.Code Cong. & Admin.News, p. 6327; S.Rep. No. 989, 95th Cong., 2d Sess. 86 (1978), U.S.Code Cong. & Admin.News, p. 5872. The Bankruptcy Code has changed the manner in which security interests can be perfected post-petition. Although nonbankruptcy law is vital, the second sentence of section 546(b) modifies applicable nonbankruptcy law to the extent that if an inchoate lien may be perfected as against prior lien holders and seizure or possession is required for perfection, notice of the intent to seize or gain possession is sufficient. For section 546(b) to be applicable, state law must provide that perfection relates back to a pre-petition event. *See In re Westport–Sandpiper Ass'n Ltd.*, 116 B.R. 355, 358 (Bankr.D.Conn.1990) (collecting cases and noting that the applicable state law must specifically authorize the relation back). This follows the principle that bankruptcy courts first look to applicable state law to determine interests in prop-

erty and the perfection of claimed liens, security interest or other encumbrances therein. *See, e.g., Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979); *In re Brass Kettle Restaurant, Inc.*, 790 F.2d 574, 575 (7th Cir.1986); *In re Kaiser*, 791 F.2d 73, 74 (7th Cir.1986), *cert. denied*, 479 U.S. 1011, 107 S.Ct. 655, 93 L.Ed.2d 710 (1986); *In re K & L, Ltd.*, 741 F.2d 1023, 1030 n. 7 (7th Cir.1984).

The majority of courts that have addressed the issue of whether section 546(b) may be used to perfect an interest in post-petition rents have answered in the affirmative. *In re Gelwicks*, 81 B.R. 445 (Bankr. N.D.Ill.1987) (a motion for relief from the automatic stay was sufficient); *In re Village Properties, Ltd.*, 723 F.2d 441 (5th Cir.1984), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984) (relief from the automatic stay to begin foreclosure proceedings was sufficient); *In re National Real Estate Ltd. Partnership–II*, 104 B.R. 968 (Bankr.E.D.Wis.1989) (notice of claim to rents sufficient); *In re Rief*, 83 B.R. 626 (Bankr.S.D.Iowa 1988) (application for sequestration of rents and profits deemed adequate notice); *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bankr.D. Colo.1986) (a complaint to prohibit use of the rents was proper notice); *In re Sampson*, 57 B.R. 304 (Bankr.E.D.Tenn.1986) (a complaint to determine the validity of a lien in rents was deemed proper notice); *In re Fluge*, 57 B.R. 451 (Bankr.D.N.D.1985) (an objection to the trustee's notice of intent to lease the property was sufficient).

Home Savings makes no assertion that it gave pre-petition notice pursuant to section 546 of its intention to perfect its security interest in rents. It was not until the filing of the present action that Home Savings effectively gave notice in these bankruptcy proceedings, long after the Debtors' collection of the medicaid funds. Late perfection under section 546 does not give a creditor any rights over amounts collected prior to the late perfection. *In re Southern Gardens, Inc.*, 39 B.R. 671 (Bankr.S.D.Ill.1982) (secured creditor found entitled to post-petition rents, but only after time of demand

for sequestration). Consequently, the filing of this adversary proceeding is insufficient, standing alone, to perfect the security interest in the funds collected post-petition by the Debtors.

Instead, Home Savings claims that its pre-petition action in asking for a receiver in the state court proceedings was sufficient to perfect the Assignment from Woodstock under paragraph 24.2 of the Lease. Several courts have discussed the type of affirmative action that must be taken by a mortgagee to perfect an assignment of rents when the mortgagor has filed a bankruptcy petition. In a leading case under the former Bankruptcy Act, Judge Merrick stated in *In re Michigan Avenue Nat. Bank*, 2 B.R. 171 (Bankr.N.D. Ill.1980):

> We hold that the Illinois law is, and for some time has been, that the mortgagee must be in actual possession in order to be entitled to rents.[62]
>
> > 62. As used here actual possession is intended to include actual possession by the mortgagee and any of his agents as well as a receiver appointed with power to collect rents. This possession would commence with the entry of an appropriate order of court and would not be dependent upon physical presence on the premises.

2 B.R. at 185.

Judge Merrick held that a mortgagee with an interest in property would have to obtain relief from the automatic stay and obtain possession of the realty before he would be entitled to rents.

In addition, the court in *Gelwicks*, stated, "in order to be entitled to the rents, the mortgagee must obtain possession of the property or the appointment of a receiver." (citation omitted). *Id.* at 447. The *Gelwicks* court went on to further note, "[i]n this case, Illinois law requires either actual possession or actual appointment of a receiver to perfect a security interest in rents. Therefore, pursuant to Section 546(b), a mortgagee may perfect a security interest in rents, post-petition, by giving proper notice." *Id.* at 448. The *Gelwicks* court found that the secured creditor was entitled to all rents collected from property after the date its post-petition motion for relief from the automatic stay was filed. In *De Kalb Bank v. Purdy*, 166 Ill.App.3d 709, 117 Ill.Dec. 606, 520 N.E.2d 957 (2d Dist.1988) the court held that a mortgagee is not entitled to rents until he takes actual possession of the property or until possession is taken on his behalf by a receiver. *Id.* at 715, 117 Ill.Dec. 606, 520 N.E.2d 957.

Home Savings contends that the Nursing Home Care Act created a statutory obstruction to its petition for the appointment of a receiver, and therefore its request for a receiver constituted "affirmative action" sufficient under section 546(b) to perfect the Assignment. It analogizes its steps taken to those of a mortgagee who files a motion for relief from the stay or for sequestration of cash collateral. Home Savings commenced the foreclosure action on February 16, 1989, and sought appointment of a receiver prior to the date of the filing of the bankruptcy petition. However, Home Savings' request for the appointment of a receiver under the Illinois Mortgage Foreclosure Law was denied.

Home Savings confuses the post-petition actions which would otherwise perfect an inchoate lien pursuant to section 546 and the pre-petition actions necessary to perfect an assignment of rents under Illinois law, in conjunction with its foreclosure action. For the period prior to the filing of a bankruptcy case, Illinois law clearly requires the appointment of a receiver on the mortgagee's behalf, or that the mortgagee be in actual possession of the mortgaged property in order to perfect an assignment of rents. *Taylor*, 239 Ill.App. at 574; *Gelwicks*, 81 B.R. at 445; *Southern Gardens*, 39 B.R. at 673. *Michigan Avenue National Bank*, 2 B.R. at 185. Home Savings had the opportunity pre-petition to perfect the Assignment and failed to do so when it unsuccessfully attempted to have a receiver appointed. Caremor was appointed receiver in a separate action for the protection of the nursing home residents, not for Home Savings' benefit to collect rents from the subject real property to reduce its indebtedness. The Court will not allow

Home Savings to bootstrap itself to a perfected secured status by claiming that its unsuccessful pre-petition attempt to perfect the Assignment constituted the requisite incident to perfect same. Similarly, its post-petition actions in filing the instant adversary proceeding long after the Debtors collected the funds are equally unavailing. Accordingly, the Court finds that Home Savings failed to timely perfect the Assignment.

## C. THE DEBTORS HAVE NOT BEEN SHOWN TO BE ALTER EGOS OF WOODSTOCK

■ Home Savings concedes that it must also demonstrate that the Debtors and Woodstock are alter egos in order to prevail on Count I. The Seventh Circuit has articulated a two-part test to determine whether a court should pierce a corporate veil and disregard that corporation's separate legal identity:

> Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.

*Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 570 (7th Cir.1985) (quoting *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 427 N.E.2d 94 (1981)). Application of this two-prong test includes consideration of other factors such as: (1) whether the corporations have maintained adequate corporate records and complied with corporate formalities; (2) whether the corporations have commingled funds or assets; (3) whether one of the corporations was undercapitalized; and (4) whether one of the corporations treated the other's assets as its own. *Id.*

■ Notwithstanding its cross motion for summary judgment, Home Savings contends that summary judgment is not appropriate for the determination of such alter ego theory, as the Court must engage in an extensive factual analysis in determining whether to disregard a corporation's presumed separate legal identity. The Debtors, on the other hand, claim that Home Savings has failed to come forward with any evidence showing that the Debtors are alter egos and instrumentalities of Woodstock. Mere assertion of the alter ego theory alone is insufficient to elevate Home Savings to secured status with respect to the Debtors' accounts receivable. The Debtors submitted an affidavit from Melvin W. Seigel ("Seigel"), a director and the president of Woodstock and the Debtors. According to Seigel, the Debtors and Woodstock were incorporated within three weeks of one another, have identical officers and directors, but throughout their histories have had separate meetings, by-laws, minute books and bank accounts.

Home Savings, on the other hand, submitted an affidavit from Clay E. Coburn ("Coburn") the vice president of Home Savings. Coburn states that he was informed that Seigel and three other individuals would operate the nursing homes. He further states he was not informed of the existence of either the Debtors or of the Subleases between the Debtors and Woodstock. Coburn conclusively states as his personal opinion that at no time has he considered Woodstock and the Debtors to be "truly independent entities." If this is the only evidence of Home Savings to support its alter ego theory, it is patently insufficient. Speculative statements are not sufficient to counter affidavits and other evidence put forward by the moving party. *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1151–1152 (7th Cir.1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989) ("[a] party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture"); *see also* 10A C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure*, § 2739 at 521–522 (2d ed. 1983). Home Savings raised the alter ego spectre, but has failed to furnish any evidence showing that the Debtors did not maintain separate corporate records or observe corporate formalities as separate Illinois corporations. No showing of com-

mingled funds or under capitalization has been proffered. Home Savings has given no evidence of other disregard of the legal fiction of separate corporate existence for any of the Debtors that make them mere alter egos of Woodstock, or vice versa.

## 2. COUNTS II AND III

Pursuant to Counts II and III, Home Savings asserts administrative claims against the Debtors' estates. Count II seeks recovery of an unspecified amount for the shortfall of the post-petition rent for the nursing home facilities which Caremor did not pay. Count III seeks to recover post-petition operating expenses in the sum of $2,527,000.00 Home Savings expended in maintaining those facilities. Those expenses allegedly include real estate property taxes, payroll and repairs. Home Savings relies upon 28 U.S.C. § 959 and certain provisions of the Nursing Home Care Act, namely paragraphs 4153–516(b), 4153–517 and 4151–119 in support of its claims for administrative priority. In addition, Home Savings contends that its claims are entitled to administrative expense status as a matter of public policy and under subrogation principles. Furthermore, Home Savings contends that its claim for post-petition rent is an actual, necessary cost of preserving the estate, for which the Debtors remain liable as "owners" of the nursing home facilities.

Pursuant to 28 U.S.C. § 959:

a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is located, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959.

It is uncontested and undisputed that Caremor, at all times post-petition, operated the nursing home facilities prior to the subsequent foreclosure sale. Additionally, paragraph 4153–517 of the Nursing Home Care Act provides that nothing in the Nursing Home Care Act shall be "construed to suspend during the receivership an obligation of the owner, administrator, or employee for payment of taxes or other operating and maintenance expenses of the facility nor of the owner, administrator, employee or any other person for the payment of mortgages or liens." Moreover, pursuant to paragraph 4153–516(b) thereof, "[i]f the operating funds are insufficient to cover the reasonable expenses of the receivership, the owner shall be liable for the deficiency." Paragraph 4151–119 further states that "in the event a facility is operated by a person who leases the physical plant, which is owned by another person, "owner" means the person who operates the facility...." Thus, Home Savings concludes that the Debtors are therefore "owners" under the statute and accordingly liable.

■ It is the Bankruptcy Code, however, not the Nursing Home Care Act, which establishes priorities among claimants seeking relief before the bankruptcy court. Furthermore, even uncontested liability of the Debtors under Home Savings' cited authorities and subrogation arguments would not elevate its claims to administrative priority status. Laws of the United States are the supreme law of the land, notwithstanding contrary laws of any state, under the United States Constitution, Article VI, Section 2, the supremacy clause. Pursuant to Article 1, Section 8 of the Constitution, the Congress is vested with power to establish uniform laws on the subject of bankruptcies. The Bankruptcy Code therefore controls in the event of any conflict in its provisions with that of the Nursing Home Care Act, especially in terms of priorities in payment of claims in bankruptcy cases.

■ Pursuant to 11 U.S.C. § 503(b)(1)(A), post-petition costs and expenses of preserving the estate are allowed as administrative expenses. Section 503 provides:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case:

. . . .

11 U.S.C. § 503(b)(1)(A).

Priority statutes such as section 503 are to be strictly construed. *In re Sinclair*, 92 B.R. 787, 788 (Bankr.S.D.Ill.1988). The burden of proving entitlement to an administrative expense is on the claimant and the standard of proof is a preponderance of the evidence. *Sinclair*, 92 B.R. at 788; *In re 1 Potato 2, Inc.*, 71 B.R. 615, 618 (Bankr.D. Minn.1987). The Seventh Circuit set forth a two-prong test for determining an administrative claim pursuant to section 503(b)(1)(A). A claim will be afforded such priority if the debt both (1) arises from a transaction with the Debtors and (2) that transaction benefited the estates in the operation of post-petition business. *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984).

 Claims should be granted administrative priority status only if the claim comports with the language and underlying purposes of section 503. *Jartran*, 732 F.2d at 588; *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 658 F.2d 1149, 1163 (7th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982) (general rule is equality of distribution; deviation must appear in the statute). In *Jartran*, the Seventh Circuit held that when third parties are induced to supply goods or services to the debtor, and the estate is benefited, the claims of those entities should be afforded priority so as to provide incentive to third parties to furnish credit necessary for the debtor's reorganization. It cannot be said that providing administrative priority to a pre-petition claim would further this policy. *Id.* at 588–589.

 In order to qualify as "actual" and "necessary" administrative expenses, expenditures must benefit the estate as a whole rather than just the creditor claimant. *In re Jartran, Inc.*, 886 F.2d 859, 871 (7th Cir.1989); *In re Jartran, Inc.*, 71 B.R.

938, 945 (Bankr.N.D.Ill.1987), *aff'd*, 886 F.2d 859 (7th Cir.1989); *see also In re Patch Graphics*, 58 B.R. 743, 746 (Bankr. W.D.Wis.1986); *In re McK, Ltd.*, 14 B.R. 518, 520 (Bankr.D.Colo.1981). In the case of *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986), the court noted that the inclusion of the words "actual" and "necessary" in section 503(b)(1) mean that the estate must accrue a real benefit from the transaction, as opposed to mere potential benefit, for administrative expense priority to be granted on claims against the estate. The use of the terms "actual" and "necessary" were not accidental, but were included to impose the requirement that the estate is actually benefitted. *In re Carmichael*, 109 B.R. 849, 851 (Bankr.N.D.Ill.1990). The language of section 503 continues the rule under the former Bankruptcy Act that a creditor's right to payment will be afforded priority only to the extent the estate was benefited in fact from the consideration supporting the creditor's claim. *See In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976); *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2nd Cir.1960). Creditors are presumed to act primarily in their own interests and not for the benefit of the estate as a whole, *In re United States Lines, Inc.*, 103 B.R. 427, 430 (Bankr.S.D.N.Y.1989), and the case law is clear that "[e]fforts undertaken by a creditor solely to further his own self-interest ... will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate." *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988).

 When the claimant has established that the estate actually benefited from the transaction, then the Court can estimate the amount of the benefit by considering the reasonable use of the property. *Carmichael*, 109 B.R. at 851; *In re Pickens–Bond Constr. Co.*, 83 B.R. 581 (Bankr.E.D. Ark.1988); *In re N–Ren Corp.*, 68 B.R. 404 (Bankr.S.D.Ohio 1986); *In re Intran Corp.*, 62 B.R. 435 (Bankr.D.Minn.1986). The bankruptcy courts have broad discretion in determining whether to award ad-

452

ministrative expense priority. That discretion is limited by the clear intent of section 503(b)(1)(A): the actual and necessary costs of preserving the estate. *See Jartran*, 732 F.2d at 586.

■ The Court finds that Home Savings' claims are not entitled to administrative expense priority for several reasons. First, the Debtors ceased operation of all four of the nursing homes prior to the filing of these cases. Home Savings disputes the Debtors' alleged pre-petition termination of the Subleases. Judge Sklodowski, however, appointed Caremor pre-petition to operate the facilities. This is undisputed as is the fact that Caremor, not the Debtors, operated all the facilities at all times post-petition prior to the subsequent state court foreclosure sale and presumed termination of Caremor's receivership. Home Savings, as assignee of the mortgagee, did not perform the statutory duties of a receiver appointed under the Nursing Home Care Act. Caremor was operating all nursing home facilities approximately one month before the voluntary Chapter 11 petitions were filed and at all times thereafter, not the Debtors. Thus, Home Savings claims for unpaid rentals and other operational expenses did not arise from the Debtors' operation of any post-petition business. Neither Home Savings' pre-petition claims or the post-petition transactions between Caremor and Home Savings are afforded administrative priority against these Debtors' estates.

Home Savings argues that an exception to the *Jartran* rule has been recognized with respect to laws that protect the public health and safety and cites several cases regarding clean up of contaminated or hazardous waste sites. Home Savings correctly states that in these cases the actual and necessary requirement of section 503(b) is subordinated to "governmental interests in health and safety, which includes using assets of the estate for the necessary cleanup." *See In re Mowbray Engineering Co.*, 67 B.R. 34 (Bankr.M.D.Ala.1986); *see also Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

Home Savings further asserts that the Nursing Home Care Act is a police power regulation intended to protect the health and safety of the citizens of the State of Illinois. Home Savings argues that during the pre-petition period in which the Debtors operated the nursing homes, they allowed the premises and the care offered to deteriorate. Home Savings contends that as a matter of public policy, and by analogy to the above-noted decisions, the Debtors should not be permitted to abandon their obligations to care for the residents of the facilities and transfer those obligations to innocent parties such as Caremor and Home Savings.

The Court finds that Home Savings is not entitled to an administrative expense priority under this theory. This exception is a judicially created abandonment exception that was first established when a debtor's real property was being abandoned pursuant to 11 U.S.C. § 554 and there was a risk to society as a whole from hazardous wastes left on the property, which was property of the bankruptcy estate under section 541. Unlike those cases, the Debtors' estates have received no benefit from Home Savings' expenditures and the shortfall from Caremor's receivership operations. The Debtors did not seek to abandon the Subleases in these proceedings. Rather, they were displaced by Caremor's appointment as receiver after Woodstock purportedly noticed them of the termination of the Subleases, effective on a date pre-petition. Home Savings' efforts conferred benefits upon a much smaller group, namely itself as holder of the Mortgage, and the residents of the nursing home facilities. The Debtors' estates derived no post-petition benefit from any of the expenditures. Thus, the situation at hand cannot be truly or fairly analogized to the magnitude and level of concerns relative to post-petition abandonment of sites which are part of bankruptcy estates polluted with environmentally hazardous waste materials. The court declines to extend the *Midlantic* exception to these cases. Home Savings' claims under Counts II and III are not properly afforded administrative priori-

ty. Rather, the claims are more appropriately classified as unsecured claims.

### 3. *COUNT IV*

██ Pursuant to Count IV of the complaint, Home Savings objects to the Debtors' plan of reorganization on several grounds. Among the objections are that the plan was not proposed in good faith; it does not comply with all Title 11 requirements; and is a scheme to have unpaid withholding tax trust fund claims paid by the estates rather than by the former owners of the Debtors. In particular, Home Savings asserts that the Debtors have failed to pursue contribution claims against Woodstock and that the plan is a mere subterfuge by which the Debtors' principals seek to avoid liability for their embezzlement of monies from the estates. The Debtors deny all such allegations. Both parties seek summary judgment on this count. The Court hereby denies both motions as no proof as to confirmation of the plan has been submitted and there are many genuine issues of material facts that preclude the entry of summary judgment.

Pursuant to 11 U.S.C. § 1128, the Court is required to conduct a hearing on confirmation, even absent objections. No such hearing has been completed. Some courts hold that an evidentiary hearing of some form is a mandatory prerequisite to confirmation. *In re Williams*, 850 F.2d 250, 253 (5th Cir.1988); *In re Acequia, Inc.*, 787 F.2d 1352, 1358 (9th Cir.1986); *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988); *In re Agawam Creative Marketing Associates, Inc.*, 63 B.R. 612, 618–619 (Bankr.D.Mass.1986). Even absent the filing of an objection, the proponent of the plan must affirmatively demonstrate that the plan is confirmable. *In re Nikron, Inc.*, 27 B.R. 773, 777 (Bankr.E.D.Mich.1983). Any party in interest may appear and object to confirmation. The Court is authorized to confirm a plan of reorganization only if all the requirements enumerated in section 1129 and other related sections are met. The proponent of the plan has the burden of demonstrating by at least a preponderance of the evidence that the plan satisfies all of the requirements of section 1129(a)(1) through (13) inclusive, except section 1129(a)(8). *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr.N.D.Ill.1990). In cases where one or more classes of impaired claims or interest holders have not accepted the plan, confirmation by cram-down pursuant to section 1129(b) is possible.

The proponents of the plan have not had the opportunity to meet their burden of proof. The Court is required to conduct a confirmation hearing in order to determine if the plan complies with the Bankruptcy Code. A confirmation hearing, conducted simultaneously with a trial on Count IV of the complaint, is the proper avenue for determination of whether the plan at bar is properly confirmable, not on cross motions for summary judgment. No real evidence on these issues has been submitted by either the plan proponents or Home Savings in support of its various objections to confirmation. At trial, both the proponents and the objectors will be afforded an opportunity to put on any evidence to establish whether or not the plan meets the requirements of section 1129. Accordingly, the Court hereby denies both motions for summary judgment as to Count IV.

### VI. CONCLUSION

For the foregoing reasons, the Court hereby grants in part the Debtors' and the Committee's joint motion for summary judgment pursuant to Counts I, II and III of the complaint and denies same as to Count IV. The Court hereby denies the cross motion of Home Savings for summary judgment. Homes Savings' claims are unsecured and contested. A trial on Count IV of the complaint, combined with the contested hearing on confirmation of the plan will be set at the pretrial and prehearing conference scheduled on November 14, 1990 at 9:00 a.m. Final Pretrial and Prehearing Orders are concurrently entered herewith.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

See written Order.

## ORDER

For the reasons set forth in a Memorandum Opinion dated the 24th day of October, 1990, the Court hereby grants in part the motion of the Debtors and the Committee for the Unsecured Creditors for summary judgment on Counts I, II and III and denies the motion as to Count IV. In addition, the Court hereby denies the cross motion of Home Savings Association of Kansas City, F.A. for summary judgment.